## Case No. 16,114.

### UNITED STATES v. RAILROAD BRIDGE CO.

[6 McLean, 517;[1] 3 Liv. Law Mag. 568.]

Circuit Court, N. D. Illinois. July Term, 1855.

PUBLIC LANDS — MILITARY RESERVATION — ABANDONMENT AND SALE — PUBLIC ROADS AND BRIDGES—OBSTRUCTIONS TO COMMERCE—CONSTITUTIONAL LAW.

1. A military reserve may be abandoned by the government, when it becomes useless for public purposes, and by giving notice through the secretary of the treasury, now the secretary of the interior, it may be considered as a part of the public lands, from which it was temporarily reserved.

2. Such lands having been surveyed and offered at public auction, may be open to entry as other lands.

3. The reserve on Rock Island, though surveyed, never having been offered for sale at public auction, does not come technically within the act of 1852, authorizing railroad companies to locate their roads through the lands of the United States. The act of 1819 [3 Stat. 520], authorizing the sale of military reserves, &c., which had become useless, embraced only those lands which had been reserved and become useless, at the time the above act was passed. The power given to the defendant to construct the road and build a bridge across the Mississippi, is not controverted.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

4. In all the Western states, within which there have been public lands, it has been the uniform practice to make public roads through the lands of the United States. This every state may do, under its power of eminent domain.

[Cited in Jones v. Florida C. & P. R. Co., 41 Fed. 72.]

[Cited in brief in Illinois Cent. R. Co. v. Chicago, B. & N. R. Co., 122 Ill. 476, 13 N. E. 140.]

5. And this power is exercised by a state, subject to no power vested in the federal government. The proprietary right of the United States can in no respect restrict or modify this exercise of the sovereign power by a state.

[Cited in Union Pac. Ry. Co. v. Burlington & M. R. R. Co., 3 Fed. 110; Illinois Cent. R. Co. v. Chicago, B. & N. R. Co., 26 Fed. 478; Union Pac. Ry. Co. v. Leavenworth, N. & S. Ry. Co., 29 Fed. 729.]

[Cited in People v. District Court (Colo. Sup.) 17 Pac. 301; Burt v. Merchants' Ins. Co., 106 Mass. 360; Flint & P. M. Ry. Co. v. Gordon, 41 Mich. 428, 2 N. W. 653; Simonson v. Thompson, 25 Minn. 453.]

6. It is essential to the welfare of the citizens of the states, that this power should be exercised.

7. So far as easements by establishing public roads, are concerned, within a state, by its legislature, the jurisdiction is exclusive.

8. The power to regulate commerce among the states is vested in congress, but the judicial power cannot act until congress shall prescribe the rule in regard to commerce.

[Cited in Gatton v. Chicago, R. I. & P. Ry. Co. (Iowa) 63 N. W. 595.]

9. Where there is an obstruction to commerce which operates to the irreparable injury of an individual, the court may act to prevent the injury.

10. This was the ground on which the jurisdiction was sustained against the Wheeling bridge, at the instance of the state of Pennsylvania.

11. And in a similar case, relief could be given to the United States.

12. But the facts in regard to the injury done to the land on Rock Island, do not authorize such an interference.

13. If the amount of injury were to be considered, to the land on Rock Island as alleged, the benefits conferred would be as five to one.

14. The bridges to be constructed over both branches of the Mississippi, at Rock Island, with the draws proposed, at the place selected, will not cause any appreciable obstruction to commerce.

[Cited in Baltimore & P. R. Co. v. Edmonds, 3 Mackey, 538.]

15. The bridge is thrown over a sluggish current more than half a mile below the rapids, which are only half the width of each of the two draws.

This is an application by the United States for an injunction against the Railroad and Bridge Company, to prevent them from constructing their railroad across Rock Island and bridges connected therewith, over both channels of the Mississippi river.

The Attorney General of the United States, and Mr. Hoyne, U. S. Dist. Atty.

Reverdy Johnson and Sargeant & Judd, for defendants.

BY THE COURT. The bill states that as early as 1812, the western extremity of Rock Island was occupied as a military post, called "Fort Armstrong"; that various buildings and fortifications were erected thereon by the United States, which were occupied for military purposes from 1816 to 1836, at which date it was evacuated by the troops of the United States, and ceased to be a military garrison. In April, 1825, the island was reserved for military purposes by the secretary of war, of which the commissioner of the general land office was informed, and by him due notice was given to the register and receiver of the land office in which the reservation was situated. By the order of the secretary of war in 1835, the whole of Rock Island was reserved for military purposes, and the register and receiver of the land office at Galena, a new land district, which included the island, were duly notified by the commissioner of the general land office. Since the troops were withdrawn from the island, it has been occupied, as the bill states, by the Indian Department, by the ordnance department, as a depot for arms, &c., and by agents of the quarter-master's department, for the protection of the property of the United States, up to the time of filing the bill. And the complainants allege, that the defendants have located their railroad over the island and by their agents have made large and deep excavations of earth and embankments, on the line of the road over the island, removing rocks and cutting timber, greatly to their injury and the injury of the soil, for which injuries no adequate remedy can be had by an action at law. And the complainants also allege, that preparation has been made by the company for the construction of a bridge over the western channel of the river, which will materially obstruct the navigation of steamboats, many of which ply upon the river, several hundred miles above Rock Island; that steamboats, in carrying on a commerce on the river, frequently take boats or barges in tow on each side of them, which would require a much wider draw to pass down the river than the one proposed to be made in the bridge, and that it would at all times be difficult and dangerous, from the rapidity of the current, for a steamboat to pass through the draw. On these grounds substantially, and on the ground that the power to regulate commerce among the several states is vested in congress, &c., an injunction is asked.

The defendants rely on two acts of the legislature of the state of Illinois, one dated in 1847, and the other in 1851, incorporating and authorizing them to locate a railroad, with one or two tracks, by the way of La Salle, from Chicago to the town of Rock Island, on the Mississippi river; and they allege that on the 17th day of January, 1853, the legislature of Illinois created the defendants a body corporate with power to build a railroad bridge across the Mississippi at or near Rock Island, or so much thereof as is

within the state of Illinois, and to connect by railroad or otherwise, with any railroads in the states of Illinois or Iowa, in such manner as shall not materially interfere with or obstruct the navigation of the river, &c. And the defendants set up the following report of the secretary of war, dated the 30th of December, 1847: "Sir,—In compliance with a resolution of the senate of the 22d instant, requiring the secretary of war 'to inform the senate, if Fort Armstrong, on Rock Island, in the state of Illinois, is now occupied as a fort; and if not. how long the same has been abandoned, in whose charge the same is, and on what terms; and also that he communicate his opinion, if the interest of the government requires that said site should be reserved from sale for military purposes.' I have the honor to transmit, herewith, reports from the adjutant general, the acting chief of ordnance, and the quarter-master general, containing the information desired; and to state that in my opinion, the interest of the government does not require that said site be longer reserved from sale for military purposes. (Signed,) Wm. L. Marcy."

The adjutant general reported that Fort Armstrong, on Rock Island, was evacuated May 4th, 1836, in pursuance of general orders, No. 9, dated January 25th of the same year. He says it was subsequently used by the ordnance department as a depot on a small scale for arms and munitions; but it is understood the stores were all removed some years since. Rock Island, he states, is not believed to be of any value for military purposes, and is considered as finally abandoned. The quarter-master general reported "that Fort Armstrong is now in charge of his department; and that Thomas Drane is employed at a compensation of sixteen dollars per month to take care of it." It is of no further use to the public as a military site, and he recommended that it be transferred to the land department. The chief of ordnance reported that as far as regards the ordnance department, he considered the reserve no longer necessary for military purposes. On the 11th of February, 1848, the secretary of war enclosed the above report to the secretary of the treasury, and says: "that the site of Fort Armstrong is no longer required for military purposes, and it is therefore hereby relinquished and placed at the disposal of the department which has charge of the public lands. (Signed) Wm. L. Marcy."

A return of the survey of the land on Rock Island, as public lands are surveyed by the surveyor general, is in evidence. Under the act of June 14th, 1809, which authorized the president of the United States to erect such fortifications as may be necessary in his opinion for the protection of the northwestern frontier, Fort Armstrong was built. But the reserve was not made in form until 1825, as above stated. By the act 3d March, 1819, the secretary of war was authorized, under the direction of the president, to cause to be sold such military sites belonging to the United States, as may have been found, or become, useless for military purposes. And the secretary of war is thereby authorized, on the payment of the consideration agreed for, into the treasury of the United States, to make, execute and deliver all needful instruments for transferring the same in fee, and the jurisdiction over the reserve ceded by a state shall cease. In 1850, the secretary of war instructed the adjutant general to write to Col. Mason, directing the sale of the reservation on Rock Island. on terms most favorable to the United States. In three or four months afterwards a telegraphic despatch postponed the sale "until further orders." By the act of the 4th of August, 1852 [10 Stat. 28], the right of way was given to all rail and plank roads or macadamized turnpike companies, that were or might be chartered over and through any of the public lands of the United States. &c., with the following proviso: "That none of the foregoing provisions of this act shall apply to, or authorize any rights in any lands of the United States, other than such as are held for private entry or sale, and such as are unsurveyed and not held for public use, by erection or improvement thereon."

The case involves several very important questions, some of which have not been heretofore raised for judicial consideration. The suit is brought by the general government, not in its sovereign capacity, but for the protection of certain public trusts, committed to it, which require, as is supposed, the exercise of the judicial power. This is more in accordance with the principles of our government, than a resort to military force. The president, under existing laws may remove trespassers from the public lands, by a military order, or by a civil action, or an indictment. Where a suit is brought by a state, or by the general government, it is subject to the forms of pleading and the rules of procedure applicable to suits between individuals; and wherever an injury is inflicted on the public rights protected by law, a remedy, civil or criminal, is given.

Congress has the exclusive power, under the constitution, to regulate commerce between two or more states, and it is contended that, in virtue of this power, the complainants have a right to maintain this suit, on the ground that the bridge proposed to be constructed will be an obstruction to commerce, and this presents a new question. The commercial power of the constitution is that which the federal government exercises in its sovereign and legislative capacity. It has regulated commerce on the Mississippi river and the other navigable rivers of the United States, so far as navigation by steamboats is concerned; and ports of delivery have been established. This regulation has extended on the Mississippi a great distance above Rock Island. But this commercial power can only be exercised and carried out by legislation;

and when this shall be done, any violation of the laws will subject the offenders to the penalties provided. The instrumentality of the judiciary can be invoked only by the government to give effect to its laws, civil or criminal, but the judicial power cannot precede that of legislation. The rule of action on all questions of policy, within the federal powers, must be prescribed by congress. There is no federal common law which pervades the Union, and constitutes a rule of judicial action. But in all the states the common law is in force, in a greater or less degree. Its existence and extent are shown by the statutes of the states respectively, and the usages of the courts. But there is no common law in regard to regulations of navigation. These must be adapted to the peculiar circumstances of a country, and the facilities which exist for traffic. In this respect, the legislation of congress is the only remedy known to the constitution. If it be admitted that the bridge would be an obstruction to the commerce of the Mississippi river, is there any power in the judiciary to remedy the evil? The commercial power is in congress, but until it shall prescribe the rule, the power is dormant. Congress has power to punish the counterfeiting of the current coin of the Union, the violation of the mail, and many other acts, but, until the law shall fix the punishment, the courts of the United States cannot punish. Neither can a proceeding by indictment or information be instituted in the judicial courts of the Union, without statutory authority. The law of redress must be enacted before redress can be given. In this respect, as a suitor, the government occupies the same position as an individual or a corporation. If there be an obstruction in or over a navigable water which injures private right, redress may be found by an action. On this ground the supreme court sustained the complaint of the state of Pennsylvania against the obstruction of the Wheeling bridge, because it was an injury to the line of transportation over its roads and canals, which it had constructed, and from which a revenue was derived. The state sued as an individual might have sued, on the ground of an injury, which, at common law, was irreparable. For such an injury the general government may obtain an injunction. But no such special injury to the property of the government is alleged in this case, except as to the reserved land on Rock Island, which allegations will be hereafter examined. The power to regulate commerce is not property, nor is it in this view a subject of judicial action where it has not been exerted.

Under the commercial power, congress may declare what shall constitute an obstruction or nuisance, by a general regulation, and provide for its abatement by indictment or information through the attorney-general; but neither under this power, nor under the power to establish post roads, can congress construct a bridge over a navigable water. This belongs to the local or state authority, within which the work is to be done. But this authority must be so exercised as not materially, to conflict with the paramount power to regulate commerce. If congress can construct a bridge over a navigable water, under the power to regulate commerce or to establish post roads, on the same principle it may make turnpike or railroads throughout the entire country. The latter power has generally been considered as exhausted in the designation of roads on which the mails are to be transported; and the former by the regulation of commerce upon the high seas and upon our rivers and lakes. If these limitations are to be departed from, there can be no others, except the discretion of congress. It is admitted, that in the regulation of commerce as a question of policy, the only limitation imposed by the constitution is, that no preference can be given to a port in one state over those of another.

Was Rock Island a military reserve at the time the alleged trespass was committed? That it was reserved for military purposes in 1825 is clear. The secretary of war, acting under the president, and by his authority, reserved it, and it was so entered on the books of the land offices at Edwardsville and Galena. And it was occupied as such until the year 1836, when it was abandoned as a military post; the troops were withdrawn, and sometime afterward the buildings were sold. The abandonment of Rock Island as a military post, and for all public purposes, was as complete as its reservation had been, by all the public authorities by whom it was selected or used. The suspension of the sale under the act of 1819 was ordered by Mr. Poinsett, secretary of war, not because it was wanted for public purposes, but on the ground that the act did not authorize its sale. On the 8th of November, 1838, he wrote to the general land office that "the reservation would not be sold under the above act, and that it was left to the general land office to take such measures for the sale of the reservation as it may deem proper under existing laws." In this view Mr. Poinsett was correct. The act referred to provided "That the secretary be, and he is hereby authorized, under the direction of the president of the United States, to cause to be sold such military sites, belonging to the United States, as may have been found or become useless for military purposes." "And the secretary of war," the act provides, "is hereby authorized, on the payment of the compensation agreed for, into the treasury of the United States," to execute a deed, &c. This law, from its language, was not intended to be a general regulation; but authorized the sale of military reserves, which, at that time, had become useless. It changed the settled mode of selling public lands, as it authorized the secretary to sell for a price agreed on, which precludes, or at least renders unnecessary a sale by public auction, as the general law for the sale of the public lands re-

quired. This consideration, as well as the purport of the section, showed that it was not a general regulation, but was intended to operate upon military reservations which then existed and which were unnecessary.

The attorney-general contends that "the frequent interposition of congress, especially authorizing the sale of military reservations, negatives the idea that they could be sold without statute authority." When land has been purchased by the United States for military or other purposes, it is admitted the land cannot be sold without the special authority of congress. In such cases the purchase is made for a specific object, and being purchased with the consent of the state, under the federal constitution, there is a cession of jurisdiction as well as of property. Now, to transfer property so acquired and relinquish the jurisdiction, the authority of congress is indispensable. And this shows the reason why the act of the 28th of April, 1825 [4 Stat. 264], was passed. It provides in the first section, "that in all cases where lands have been, or shall hereafter be conveyed to or for the United States, for forts, arsenals, dock yards, light houses, or any like purpose, etc., which shall not be used as necessary for the purpose for which they were purchased or other authorized purposes, it shall be lawful for the president of the United States, to cause the same to be sold for the best price to be obtained, and to convey the same by grant or otherwise." Now, from this act it does not follow, that where the government reserves its own land from sale, for any public purpose, that a special act of congress after its abandonment is necessary for the sale of it. The president, under a general power given him by the act of 1808 [2 Stat. 496], selected a part of the land on Rock Island for a military site, on which Fort Armstrong was built. And when he finds the place no longer useful as a military post, or for any other public purpose, he has a right to abandon it, and notify the land offices where the reservation was entered. The entry on the books of the land offices within which the reserved site is situated, and the occupancy of the place by the government, are the only evidence of the reservation. And when this evidence is withdrawn, and the site is abandoned, the reserve falls back into the mass of the public lands subject to be sold under the general law. But before such land can be sold at private sale under the general system, it must, by proclamation, be offered at public auction. The proclamation should give notice of the sale of the reserved tract as other lands. In this mode, I think, the sale would be a valid one.

The right claimed in the case of Wilcox v. Jackson, 13 Pet. [38 U. S.] 500, was a preemption under the act of 1834, which declared that "no entry or sale of any land shall be made under the provisions of the act, which shall have been reserved for the use of the United States, or which is reserved for sale by act of congress or order of the president, or which may be appropriated for any purpose whatever." Before the entry was made as a pre-emptive right by Beaubin, a light house upon the reserve was built by the government, and the possession of it for public purposes had never been abandoned. Under the circumstances stated, Rock Island cannot be considered as a military reserve. The possession of it was abandoned, and the right of government released through the same authority, by which it was appropriated. And no act has been done by the government, by which a new appropriation of the ground for military or any other public purpose is shown or can be presumed. The buildings had been sold by the government. The sale of the reserve was suspended, it is presumed, because there was no power to sell by the war department under the act of 1819. That the suspension of the sale was in no respect influenced by a desire to retain Rock Island for any public purpose, appears by the subsequent action of the war department.

The next inquiry is, whether the land in question is within the provision of the act of congress of August 4th, 1852, which grants the right of way through the public lands to all roads, etc. The first section of that act grants right of way to "all railroads and McAdamized turnpike companies, that may be chartered within ten years, over and through any of the public lands of the United States, may be authorized by an act of the legislature of the respective states in which public lands may be situated," etc. To the 3d section of that act there are several provisos, the last of which is: "That none of the foregoing provisions of this act shall apply to or authorize any rights in any lands of the United States, other than such as are held for private entry and sale, and such as are unsurveyed and not held for public use by erections or improvements thereon." This act required the proper officers of such road to transmit to the commissioner of the general land office, "a correct plan of the survey of the road, together with the survey of sites for depots, which were granted on the line of such selection, which shall become operative." This survey of the road and of sites for depots on it, was transmitted to the commissioner of the general land office, as the act required. In a report of the commissioner of the general land office to the secretary of the interior, dated 19th of January, 1854, the commissioner says, by way of note: "As regards the right of way for the road, (now under consideration,) it is already granted by the general act entitled, 'An act to grant the right of way to all railroads.' &c." In the same report the commissioner states, "that several bills have been reported to congress

of late years, materially changing the mode of disposing of such reservations, which are now on special file." The opinion of the commissioner, as to the right of way or the necessity of legislation, before reserves can be sold, whether right or wrong, can have no influence in the decision of this case. A part of the land on Rock Island has been granted, and it is proposed to make, in addition, one or more private grants. This shows, at least, that the reserve does not, in the opinion of congress, remain to the extent of the island. Although this land cannot be now considered a military reserve, yet it is not "held," in the language of the law, "for private entry and sale." Under the general law, no public land can be so considered, which has not been offered at public auction, under the proclamation of the president In giving a construction to this act, the court is not at liberty to change the meaning by changing the copulative conjunction into a disjunctive. If effect could be given to the argument, in this respect, it would pervert the meaning of the act. But this reading, if it were admissible, would not change the effect of the act. Land is not held for private entry, which has not been offered at public sale; nor is land held for sale in the meaning of the law, which has not been so offered. It is true the land was directed to be sold under the act of 1819; but as that act did not authorize such a sale, the land cannot be considered to have been held for private sale. The other member of the sentence describing lands within the act is: "And such (lands) as are unsurveyed and not held for public use by erection and improvements thereon." Now this provision applies to the period of time, when the right is claimed by the railroad. The ground in question was appropriated for military purposes. but when the entry on the land complained of was made, it was not a military reservation; and any improvements thereon had been, not only abandoned and sold, but the former reservation was relinquished and annulled. To hold then, under the circumstances, that the land was still a military reservation for any public use, would disregard the facts in the case. Whether the government might not have again reserved the land for some public purpose is a question not involved in the decision. It would be in it, if there were any evidence that such reservation had been made. To presume such a reservation would be against the evidence.

The improvements under the above statute having been abandoned and sold, may be considered as not having been made, and so as to the reservation. But still the provision is not technically within the statute. It refers to lands "unsurveyed," and the lands on Rock Island have been surveyed. This is a technical objection, and to such objection some minds on the bench and at the bar are strongly inclined. My taste does not lie in this line, as it often defeats the great ends of justice, and preserves nothing of any value. The charter granted by the state of Illinois, to the defendants, authorizes them to locate and construct their road, to purchase the right of way, to condemn the land where necessary, and have the damages assessed as provided for in the charter. And in regard to the construction of a railroad across the Mississippi river, the company is vested with power to build, maintain, and use a railroad bridge over the river, or that portion of it which is within the jurisdiction of the state of Illinois, at or near Rock Island, in such manner as shall not materially obstruct or interfere with the free navigation of the river; and to connect by said road or otherwise, such bridge with any railroad, either in the state of Illinois or Iowa, terminating at or near said point; to unite or consolidate its franchises and property with any or all bridges or railroad companies in either of said states." That the state of Illinois had power to grant the charters for the road and bridge, has not been questioned. A doubt might once have been entertained, whether a state could, under the power of eminent domain, confer the power of appropriation to private companies; but this power has been so long exercised and acquiesced in, that it is now, probably, too late to question it.

Whether a state has power by an act of incorporation or otherwise, to authorize a rail or turnpike road through the lands of the United States, has not, it is believed, been raised or judicially decided. The first impression would be, probably, that a state cannot exercise such a power. But first impressions are rarely to be followed on constitutional questions. They should be deliberately and deeply considered, in relation to their bearing on the federal and state powers. That the federal government is one of enumerated powers is not controverted; nor that the states reserved to themselves all powers not conferred on the general government, absolutely or by necessary implication. In the admission of new states into the Union, compacts were entered into with the federal government, that they would not tax the lands of the United States. This implies that the states had power to tax such land, if unrestrained by compact. The constitution provides, "that congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Under this provision congress organized territorial governments. Having power to sell the public lands, beyond the limits of any state, a territorial government was the only mode by which the purchasers and occupants of those lands could be protected in their rights of persons and property. Hence the implied power to establish such a government. The constitution was adopted a short time after the ordinance of 1787 was passed; and as that ordinance provided for

the government of all the territory owned by the United States, no express provision for a territorial government was deemed necessary. In that ordinance it was declared that the states to be formed out of the territory "should never interfere with the primary disposal of the soil by the United States, in congress, nor with any regulation congress may find necessary for securing the title in such soil to bona fide purchasers." Within the limits of a state, congress can, in regard to the disposition of the public lands and their protection, make all needful rules and regulations. But beyond this it can exercise no other acts of sovereignty which it may not exercise in common over the lands of individuals. A mode is provided for the cession of jurisdiction when the federal government purchase a site for a military post, a custom-house, and other public buildings; and if this mode be not pursued, the jurisdiction of the state over the ground purchased remains the same as before the purchase. This, I admit, is not a decided point, but I think the conclusion is maintainable, by the deductions of constitutional law.

Under acts of congress, trespasses on the public lands are liable to a civil or criminal prosecution. And yet the statutes of congress are numerous, giving the settlers upon those lands without authority (which makes them trespassers,) pre-emption rights. And this latter policy has become so popular as to induce settlers to take possession of the best portion of the public lands, before they are surveyed or offered for sale. This policy of punishing acts in some, which are rewarded in others, seems to be inconsistent. The only excuse for the provision is, that he who takes the timber from the ground, renders it less valuable and enriches himself; while the other settles on the land with the view of purchasing it. But he is not obliged to make the purchase, and while in possession he may take from it the most valuable timber.

[In the case of Johnson v. McIntosh, 8 Wheat. [21 U. S.] 543, it was held, "a state has a perfect right to legislate as she may please, in regard to the remedies to be prosecuted in her courts, and to regulate the disposition of the property of her citizens by descent, devise or alienation. But congress is invested by the constitution with the power of disposing of the public lands, and making needful rules and regulations concerning it."

[The proprietary right to lands in a state held by the federal government is, in many respects, similar to that of an individual. A compact may exempt the lands of either from taxation. An action may be brought by either, for an injury done to the soil or timber. A conveyance of the title is made by the federal government under its own laws, and by the individual under the law of the state. The principal distinction under the two proprietorships is, that the government makes the conveyance under its own laws, and sues in its own courts, whilst an individual proprietor conveys under the laws of the state, and prosecutes under those laws for an injury done. But the important inquiry is, whether the public lands are subject to the sovereignty of the state in which they are situated.] [2]

It is a fair implication, that if the state were not restrained by compact, it could tax such lands. In many instances the states have taxed the lands on which our custom houses and other public buildings have been constructed, and such taxes have been paid by the federal government. This applies only to the lands owned by the government as a proprietor, the jurisdiction never having been ceded by the state. The proprietorship of land in a state by the general government, cannot, it would seem, enlarge its sovereignty or restrict the sovereignty of the state. This sovereignty extends to the state limits over the territory of the state, subject only to the proprietary right of the lands owned by the federal government, and the right to dispose of such lands and protect them, under such regulations as it may deem proper. The state organizes its territory into counties and townships, and regulates its process throughout its limits. And in the discharge of the ordinary functions of sovereignty, a state has a right to provide for intercourse between the citizens, commercial and otherwise, in every part of the state, by the establishment of easements; whether they may be common roads, turnpike, plank or railroads. The kind of easement must depend upon the discretion of the legislature. And this power extends as well over the lands owned by the United States, as to those owned by individuals. This power, it is believed, has been exercised by all the states in which the public lands have been situated. It is a power which belongs to the state, and the exercise of which is essential to the prosperity and advancement of the country. State and county roads have been established and constructed over the public lands in a state under the laws of the state, without any doubt of its power, and with the acquiescence of the federal government. In this respect the lands of the public have been treated and appropriated by the state as the lands of individuals. These easements have so manifestly conduced to the public interest, that no objection, from any quarter, has hitherto been made. And it is believed that this power belongs to the states.

It is difficult to perceive on what principle the mere ownership of land by the general government within a state, should prohibit the exercise of the sovereign power of the state in so important a matter as the easements named. In no point of view are these improvements prejudicial to the general interest; on the contrary, they greatly promote it. They encourage population, and in-

---

[2] [From 3 Liv. Law Mag. 568.]

crease the value of land. In no respect is the exercise of this power by the state inconsistent with a fair construction of the constitutional power of congress over the public lands. It does not interfere with the disposition of the lands, and instead of lessening enhances their value.

Where lands are reserved or held by the general government for specified and national purposes, it may be admitted that a state cannot construct an easement which shall in any degree, affect such purposes injuriously. No one can question the right of the federal government to select the sites for its forts, arsenals and other public buildings. The right claimed for the state has no reference to lands specially appropriated, but to those held as general proprietor by the government, whether surveyed or not. The right of eminent domain appertains to a state sovereignty, and it is exercised free from the restraints of the federal constitution. The property of individuals is subject to this right, and no reason is perceived why the aggregate property, in a state, of the individuals of the Union, should not also be subject to it. The principle is the same, and the beneficial result to the proprietors is the same, in proportion to their interests. These easements have their source in state power, and do not belong to federal action. They are necessary for the public at large, and essential to the interests of the people of the state. The power of a state to construct a road, necessarily implies the right, not only to appropriate the line of the road, but the materials necessary for its construction and use. Whether we look to principle, or the structure of the federal and state governments, or the uniform practice of the new states, there would seem to be no doubt that a state has the power to construct a public road through the public lands. A grant to this effect is sometimes made by congress, as in the act of 1852; but this does not show the necessity of such a grant. Generally, congress appropriates to the road a large amount of lands. The positions are believed to be irrefragable—first, that the right of eminent domain is in the state; and secondly, that the exercise of this right by a state is no where inhibited, expressly or impliedly, in the federal constitution, or in the powers over the public lands by that instrument, in congress.

If this view be correct, the question is narrowed to the simple inquiry, whether the construction of the road, through Rock Island, connected at both ends by bridges over both channels of the river, which include the island, will do an irreparable injury to the public land on the island. Several witnesses have been examined on this point, and, as usual, there are among them differences of opinion. But the weight of the evidence does not show an irreparable injury. On the contrary, it appears that the works complained of will add greatly to the value of the island. From the nature of the improvement, this is so palpable as to require no illustration. By the flow of the river, on either side of the island, its inhabitants are cut off from all intercourse with the shores, except by a ferry. But the bridges proposed, and the railway, will connect the island with both shores, and bring over it a line of travel for passengers, and for the transportation of merchandise, which must add several hundred per cent. to the value of the island and its products.

The testimony in regard to the obstructions to commerce by the proposed bridge, is contradictory. Many witnesses have been examined on both sides, and while those called by the plaintiffs say the bridge will, in a great degree, destroy the commerce of the river, those called by the defendants think it will be no material obstruction. This discrepancy manifestly arises from a mistake in the locality of the bridge. The defendants' witnesses live in the neighborhood of the structure, and speak of it as located, whilst the witnesses of the plaintiffs fix the bridge much higher up the river, and where, from the rapid current occasioned by the falls and the ledges of rock which confine the water to a width of sixty feet, at the foot of the rapids, there is a short turn to the left in the channel, very near the proposed bridge, which would render the passage through the draw, if not impracticable, extremely dangerous. But the experienced engineer, Mr. Brayton, who superintends the building of the bridge, has taken the soundings of the river, and surveyed and measured the distance on it from the side of the bridge to the falls, and above them. This work is laid down on a map which he refers to. He says: "From the bridge up and on the sides of the river there are two chains of rock which at the bridge are widest apart, and gradually converging as you ascend, until at the distance of about two-thirds of a mile above the bridge, the channel becomes quite narrow, not exceeding in width sixty feet; that this narrow opening is in nearly a right line with the channel, as it runs through said point to the proposed draw in the bridge." And it appears from the soundings that the bridge is thrown over the deepest water in that part of the river. The engineer says "the plan upon which the bridge is being constructed is a wooden superstructure, built upon Howe's patent, supported by two stone abutments and six piers, laid in water cement. The span between the piers is two hundred and fifty feet in the clear, except the draw. The draw is to be a turn-table draw, two hundred and eighty-four feet in length, supported in the center by a circular stone pier of solid masonry, leaving an opening on each side of such turn-table pier, one hundred and twenty feet in the clear. That such draw is over the main channel and deepest water of the river on the line where the bridge crosses;" and that it is the line of navigation uniformly taken by the boats running up and down.

Except the earth used for the embankment across the island for the road, but few of the materials for the work have been taken from the island. The rock on the island was unfit for masonry, and some of it has been used to fill up the unexposed part of the abutments of the bridge and a small amount of rif-raf work. The embankment is shown to be half a mile from the principal building at Fort Armstrong. Convenient passage ways have been made under the railroad, so that there is no obstruction to the passage from one end of the island to the other. It seems that about one hundred and fifty thousand dollars have been expended by the company on the road over the island, and on the bridges. Thirteen acres and a half of the land on the island appears to be occupied by the road. Several of the witnesses estimate the value of the land without the bridge and the road, at one hundred and fifty dollars per acre; the road being made, and the bridges, they suppose it will be worth one thousand dollars per acre.

One of the witnesses for the defendants states, that he has long acted as a pilot for steamboats and rafts over the rapids, and is well acquainted with the river; that for more than half a mile above the bridge, the channel from the draw up is straight, running to the opening in the rocks, known as "Shoemaker's Chain," and that the velocity of the current from the chain to the bridge, is little more than two and a half miles per hour. The piers, except where the draws are placed, are two hundred and fifty feet apart, which affords ample space for rafts, the bridge being elevated above low water some thirty-three feet, and twenty feet above high water. The falls, it would seem, must, from the rapidity, sinuosity, and narrowness of the channel, present the principal obstructions to the navigation of this part of the river. Rafts or barges attached to steamboats are loosened, before descending the falls, and they are floated down under the direction of a pilot. This, it is said, is never done in the night, unless the river is high. Whatever improvements may be made in widening this channel, it is hardly probable that it will be extended to double its present width, which would make it equal only to either of the draws below. And if this were done, the passage of the draws over a deep, straight and sluggish current, would be much safer than the rapids. Indeed, from the concurrent views of the witnesses who speak of the bridge where it is being constructed, there will be but little or no delay or hazard in passing the draws. If any injury should result to boats from any want of attention by the bridge company, or the structure of the draw, they being managed with reasonable care, an action at law may be resorted to, as in other cases of wrong.

Having considered this great case, in regard to the legal principles involved under the federal and state governments, the magnitude of the enterprise, the interest of the public in the road and in the commerce of the Mississippi river, I am brought to the conclusion that the complainants are not entitled to the relief asked; and, therefore, the motion for an injunction is overruled.