(Slip Opinion)

# Revocation of Prior Monument Designations

The Antiquities Act of 1906 permits a President to alter a prior declaration of a national monument, including by finding that the "landmarks," "structures," or "objects" identified in the prior declaration either never were or no longer are deserving of the Act's protections; and such an alteration can have the effect of eliminating entirely the reservation of the parcel of land previously associated with a national monument.

The contrary conclusion of the Attorney General in *Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Att'y Gen. 185 (1938), was incorrect, and that opinion can no longer be relied upon.

May 27, 2025

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

In the midst of public concerns that the Pueblo ruins were being "vandalized by pottery diggers for personal gain," Congress passed the Antiquities Act of 1906 to empower the President to declare protected national monuments.[1] From these modest beginnings, the President's authority under the Antiquities Act has come to be described as "one of the most sweeping unilateral powers available to a chief executive."[2] Without "any congressional approval, formal studies, or public participation,"[3] Presidents have used that power to withhold vast swaths of the American land- and seascape from potentially beneficial economic use by designating over 100 national monuments, the largest of which spans 582,578 square miles or 373 million acres.[4]

---

[1] Ronald F. Lee, *The Antiquities Act of 1906* 33, 48 (1970) (internal quotation marks omitted); *Preservation of Prehistoric Ruins on the Public Lands: Hearings Before the H. Comm. on the Pub. Lands*, 58th Cong. 11–15 (1905) ("*H. Hearing*") (statement of Rep. Bernard Shandon Rodey).

[2] John Murdock, *Monumental Power: Can Past Proclamations Under the Antiquities Act Be Trumped?*, 22 Tex. Rev. L. & Pol. 349, 351 (2018).

[3] *Id.*

[4] *See National Monuments Facts and Figures*, Nat'l Park Serv., https://www.nps.gov/subjects/archeology/national-monument-facts-and-figures.htm (Jan. 22, 2025); *About Papahānaumokuākeam*, Papahānaumokuākea Marine National Monument, https://www.papahanaumokuakea.gov/ (last visited May 13, 2025); Jennifer Melroy, *The Complete List of US National Monuments By State (2022 Update)*, National Park Obsessed, https://nationalparkobsessed.com/list-of-national-monuments/ (May 22, 2022).

In 2025, President Biden exercised this power to establish the Chuck-walla and the Sáttítla Highlands National Monuments.[5] Because "[t]he creation of [such] national monument[s] is of no small consequence," *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980–81 (2021) (statement of Roberts, C.J., respecting the denial of certiorari), you asked us to examine whether the Act permits the President to revoke President Biden's proclamations creating the Chuckwalla and the Sáttítla Highlands National Monuments. You further asked whether we should disavow the opinion of Attorney General Homer Cummings titled *Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Att'y Gen. 185 (1938) ("*Castle Pinckney*"), which has long been cited as a reason for treating the declaration of a monument under the Antiquities Act as irrevocable.[6] We think that the President can, and we should.

## I.

### A.

Following the Civil War, pieces of art, pottery, or other items taken from the "abandoned and ruined dwellings of prehistoric man in the American West" became something of a fad among collectors on the East Coast. *See* Lee, *supra* note 1, at 1. This demand led to an unfortunate 19th century practice that professional archaeologists called "pot-hunting," in which "amateur excavators removed a significant number of artifacts from these delicate sites." Catarina Conran, Note, *Monumental Change? Rethinking the Role of the Courts in the Antiquities Act*, 40 Va. Env't L.J., 169, 176–77 (2022). These pot-hunters "extract[ed] all available objects of value" from archaeological sites and left "the environment" nearby "so completely disfigured in the process that the remains become valueless for scientific purposes." *Preservation of Historic and Prehistoric Ruins, Etc., Hearing Before the Subcomm. of the S. Comm. on Pub. Lands*, S. Doc.

---

[5] Proclamation 10881 of January 14, 2025 (Establishment of the Chuckwalla National Monument); Proclamation 10882 of January 14, 2025 (Establishment of the Sáttítla Highlands National Monument).

[6] *E.g.*, Mark Squillace et al., *Presidents Lack the Authority to Abolish or Diminish National Monuments*, 103 Va. L. Rev. Online 55, 58 (2017) ("*Authority*"); Hope M. Babcock, *Rescission of A Previously Designated National Monument: A Bad Idea Whose Time Has Not Come*, 37 Stan. Env't L.J. 3, 63 n.23 (2017).

No. 314, 58th Cong. 4 (1904) ("S. Doc. 58-314"). In response, the archaeological community conceived of, and lobbied for, what became the Antiquities Act.

The effort stirred controversy from the start. In total, three different Congresses considered 14 separate versions of the Antiquities Act.[7] Early efforts failed in large part because of "past experience with the timber reservations act of 1891 ['Timber Act']," which had already been used to establish "13 new forest reserves, containing 15.5 million acres, on public lands"—a figure that by 1907 would balloon to "150,832,665 acres in 159 national forests." Lee, *supra* note 1, at 155–56 (internal quotation marks omitted). "Against this background, any proposed antiquities legislation that included broad authority for the President to create new parks or monuments out of the public lands was sure to meet with opposition" from those who hoped to develop public lands. *Id.* at 56.

Western lawmakers were particularly vocal critics. For example, in 1905, Representative Rodey of New Mexico complained that "if all the ruins in northern New Mexico were withdrawn from entry there would be a tract of country withdrawn as big as the State of New York." *H. Hearing*, *supra* note 1, at 13. When combined with other types of reservations, he further warned, "the danger is that . . . they will practically have the whole continental divide withdrawn from entry," which "will be a detriment to the country." *Id.*

This sentiment was echoed 18 months later in an exchange between the sponsor of the bill and a Representative from Texas:

> Mr. LACEY. There has been an effort made to have national parks in some of these regions, but this will merely make small reservations where the objects are of sufficient interest to preserve them.
>
> Mr. STEPHENS of Texas. Will that take this land off the market, or can they still be settled on as part of the public domain?

---

[7] S. 4698, 59th Cong. (1906); H.R. 11016, 59th Cong. (1906); S. 4127, 58th Cong. (1904); S. 5603, 58th Cong. (1904); H.R. 12141, 58th Cong. (1904); H.R. 12447, 58th Cong. (1904); H.R. 13349, 58th Cong (1904); H.R. 13478, 58th Cong. (1904); H.R. 8066, 56th Cong. (1900); H.R. 8195, 56th Cong. (1900); H.R. 9245, 56th Cong. (1900); H.R. 10451, 56th Cong. (1900); H.R. 11021, 56th Cong. (1900); H.R. 13071, 56th Cong. (1900); *see also* Lee, *supra* note 1, at 47 (summarizing the legislative history of the Act).

Mr. LACEY. It will take that portion of the reservation out of the market. It is meant to cover the cave dwellers and cliff dwellers.

Mr. STEPHENS of Texas. How much land will be taken off the market in the Western States by the passage of the bill?

Mr. LACEY. Not very much. The bill provides that it shall be the smallest area necess[a]ry for the care and maintenance of the objects to be preserved.

Mr. STEPHENS of Texas. Would it be anything like the forest-reserve bill, by which seventy or eighty million acres of land in the United States have been tied up?

Mr. LACEY. Certainly not. The object is entirely different. It is to preserve these old objects of special interest and the Indian remains in the pueblos in the Southwest, whilst the other reserves the forests and the water courses.

40 Cong. Rec. 7888 (1906).

Notably, though the issue was raised in other contexts, none of the debates regarding the antiquities bills addressed whether the President would have authority to revisit a prior declaration made thereunder. And the evolution of the text sheds little light on the question. An earlier version of the statute would have empowered the Secretary of the Interior to "make *temporary withdrawals* of the land on which . . . antiquities are located," as well as "*permanent withdrawals* of tracts of land on which are ruins and antiquities of special importance, not exceeding six hundred and forty acres in any one place." S. 5603, 58th Cong. § 2 (as reported by H. Comm. on the Pub. Lands January 19, 1905) (emphases added). But the record is silent regarding why the final version—which was drafted by an archaeologist rather than a lawyer—dropped that language.

As finally adopted, the Antiquities Act read in relevant part:

[T]he President of the United States is hereby authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of

which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

Pub. L. No. 59-209, § 2, 34 Stat. 225, 225 (previously codified at 16 U.S.C. § 431 (2013)).

As this language makes clear—notwithstanding how they are often described—the "monument" is not the "parcel of land" identified in a presidential declaration. *Id.* Instead, it is the "landmark," "structure" or "other object" declared to be of historic or scientific interest by the President. *Id.*; *see also Mass. Lobstermen's*, 141 S. Ct. at 981. Consistent with that text, unless used in a proper noun or quotation, this memorandum uses "monument" to refer to the "landmark," "structure," or "object," and "parcel" to refer to the land set aside for its protection.[8]

## B.

Since the earliest days of the Act, Presidents have "from time to time diminished" the parcel set aside to protect monuments. *See Castle Pinckney*, 39 Op. Att'y Gen. at 188; Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 585–610 (2003) ("*Legacy*"). And they have done so in substantial amounts, either for unclear reasons or for reasons that are irreconcilable with the view that declaration of a landmark, structure, or other object to be a national monument is irrevocable.

For example, in 1911, President Taft reduced the size of the 60,776-acre Petrified Forest National Monument by 25,625 acres, stating only that a geological survey allowed the relevant land to be "more particularly located and described."[9] The next year, he diminished the 639,200-acre Mount Olympus National Monument by 160 acres with even

---

[8] To the extent prior writings of this Office are premised on defining the "monument" for Antiquities Act purposes to be the parcel rather than the landmark, structure, or other object, like *Castle Pinckney*, they too are disavowed as inconsistent with the statutory text and may not be relied upon as Executive Branch precedent.

[9] *See* Proclamation No. 1167, 37 Stat. 1716, 1716 (1911). Antiquities Act proclamations typically do not specify the size of the relevant parcels. Unless otherwise specified, we obtained such figures from Squillace, *Legacy*, 37 Ga. L. Rev. at 585–610. *See also* Brad Traver, *State of the Park in the NPS Centennial Year*, Friends of Petrified Forest National Park (May 23, 2016), https://www.friendsofpetrifiedforest.org/state-of-the-park-in-the-nps-centennial-year/.

less explanation.[10] And these were not isolated incidents. Presidents over the years repeatedly made alterations large[11] and small[12] to the parcels reserved to protect and manage declared monuments. In other instances, the President has functionally amended a proclamation by permitting a previously reserved parcel to be used in ways that are irreconcilable with protecting a monument—for example, by allowing for a highway to be constructed through a "strip of land" in the Craters of the Moon National Monument. Proclamation No. 2499, 55 Stat. 1660, 1660 (1941).[13]

In some instances, Presidents have removed acreage from parcels reserved under the Antiquities Act after expressly determining that the land in question was no longer needed to preserve the national monuments. For example, President Eisenhower reduced the size of the Great Sand Dunes National Monument because, in his view, "retention of certain lands

---

[10] Proclamation No. 1191, 37 Stat. 1737 (1912); *The Antiquities Act and America's National Monuments: A timeline of milestones* (Mar. 8, 2019), Pew Charitable Trusts, https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2019/03/the-antiquities-act-and-americas-national-monuments.

[11] *See, e.g.*, Proclamation No. 2393, 54 Stat. 2692 (1940) (diminishing the 273,145-acre so-called Grand Canyon "II" National Monument by 71,854 acres); Proclamation No. 1293, 39 Stat. 1726 (1915) (diminishing the 639,200-acre Mount Olympus National Monument by 313,280 acres); Proclamation No. 2659, 59 Stat. 877 (1945) (diminishing the 9,500-acre Santa Rosa Island National Monument by 4,700 acres); *see also* Squillace, *Legacy*, 37 Ga. L. Rev. at 564; Amy Joi O'Donoghue, *Times in History When U.S. Presidents Have Acted to Shrink Monuments*, Deseret News (June 12, 2017), https://www.deseret.com/2017/6/12/20634269/times-in-history-when-u-s-presidents-have-acted-to-shrink-monuments/.

[12] *See, e.g.*, Proclamation No. 3307, 73 Stat. c69 (1959) (diminishing the approximately 20,500-acre Colorado National Monument by 211 acres); Proclamation No. 2454, 55 Stat. 1608 (1941) (diminishing the then-35,422-acre Wupatki National Monument by 52 acres); Proclamation No. 3344, 74 Stat c56 (1960) (diminishing the now 15,599 acre Black Canyon of the Gunnison National Monument by 470 acres); *see also Colorado National Monument*, History Colorado, https://www.historycolorado.org/colorado-national-monument (last visited May 14, 2025); *Wupatki National Monument, Arizona*, Nat'l Park Serv., https://www.nps.gov/wupa/learn/historyculture/index.htm (May 18, 2024); *Black Canyon of the Gunnison*, Nat'l Park Serv., https://www.nps.gov/blca/learn/wilderness.htm (Apr. 24, 2025).

[13] *See also, e.g.*, Proclamation No. 2454, 55 Stat. 1608 (1941) (reducing the Wupatki National Monument to build a "diversion dam in Little Colorado River to facilitate the irrigation of lands on the Navajo Indian Reservation"); Proclamation No. 2295, 53 Stat. 2465 (1938) (reducing the White Sands National Monument to allow for U.S. Highway 70).

within the monument [wa]s no longer necessary for" the purpose of preserving "the great sand dunes and additional features of scenic, scientific, and educational interests." Proclamation No. 3138, 70 Stat. c31, c31 (1956). And President Kennedy "exclude[d]" from the Natural Bridges National Monument 430 acres "known as Snow Flat Spring Cave and Cigarette Spring Cave, which no longer contain[ed] features of archeological value," Proclamation No. 3486, 76 Stat. 1495, 1496 (1962).

In others, Presidents have de-designated monuments and removed from a previously reserved parcel the land set aside to protect them after concluding that the objects were not of sufficient scientific or historical interest to be declared a national monument.[14] For example, President Kennedy "exclude[d] from the detached Otowi section of the" Bandelier National Monument "approximately 3,925 acres of land" that he concluded "contain[ed] limited archeological values which had been fully researched," as well as because the land was "not needed to complete the interpretive story" of the monument. Proclamation No. 3539, 77 Stat. 1006, 1006 (1963).

Similarly, in creating the Navajo National Monument, President Taft noted that:

> a number of prehistoric cliff dwellings and pueblo ruins, situated within the Navajo Indian Reservation, . . . are new to science and *wholly unexplored*, and . . . their isolation and size are of the very greatest ethnological, scientific and education interest, . . . it appears that the public interest would be promoted by reserving these extraordinary ruins of an unknown people, with as much land as may be necessary for the proper protection thereof.

Proclamation No. 873, 36 Stat. 2491, 2491 (1909) (emphasis added). Over the next three years, a survey identified what ruins or other landmarks

---

[14] We are aware that a fairly large number of commentators have stated that a President has never "attempted to abolish a previously established national monument by proclamation." Alexandra M. Wyatt, Cong. Research Serv., R44687, *Antiquities Act: Scope of Authority for Modification of National Monuments* at 3 (Nov. 14, 2016). Such assertions depend on incorrectly treating the *parcel* as the monument rather than the *object*. Cf., e.g., *id.* at 4; Heidi M. Biasi, *The Antiquities Act of 1906 and Presidential Proclamations: A Retrospective and Prospective Analysis of President William J. Clinton's Quest to "Win the West"*, 9 Buff. Envt'l L.J. 189, 240 (2002).

merited protecting, which led the President to reduce the reservation from "160 square miles to three small noncontiguous tracts totaling 360 acres."[15] The President thus revoked the monument designation for any and all ruins or objects of historic or scientific interests that had been included in the original 100,000-acre parcel but fell outside the smaller parcels. *Cf.* Squillace, *Legacy*, 37 Ga. L. Rev. at 556 n.486.

Presidents have even de-designated monuments or removed land from previously reserved parcels based on their view that the land itself could be put to better use. For example, President Theodore Roosevelt declared the Mount Olympus National Monument (at least in part) to preserve the habitat of a certain species of elk. Proclamation No. 869, 35 Stat. 2247 (1909). President Wilson reduced that parcel to allow construction of a railroad and timber production.[16] And this was only one of three separate instances when the monument was reduced, Proclamation No. 1191, 37 Stat. 1737 (April 17, 1912), Proclamation No. 1293, 39 Stat. 1726 (May 11, 1915), Proclamation No. 1862, 45 Stat. 2984 (Jan. 7, 1929), by a collective 314,080 acres, O'Donoghue, *supra* note 11. Three years before *Castle Pinckney*, the Solicitor of the Department of the Interior issued an opinion explaining that the President had the authority to take such action based in part on an implied withdrawal authority, which the Supreme Court had recognized in *United States v. Midwest Oil Co.*, 236 U.S. 459, 469–71 (1915), and in part on the Antiquities Act's requirement that the parcel reserved to protect a monument be of the "smallest area compatible with the proper care and management of the objects sought to be protected," U.S. Dep't of the Interior, Office of the Solicitor, Solicitor's Opinion of January 30, 1935, M-27657 ("Solicitor's Op. M-27657").

Although not common, the Mount Olympus National Monument was not the only parcel set aside under the Antiquities Act to have been re-

---

[15] National Park Service, *Foundation Document: Navajo National Monument, Arizona* 4 (Aug. 2017), https://www.npshistory.com/publications/foundation-documents/nava-fd-2017.pdf; *see also* Hal K. Rothman, *Navajo National Monument: A Place and Its People: An Administrative History* 20 (1991), https://www.npshistory.com/publications/nava/adhi.pdf ("*Navajo*"); Proclamation No. 1186, 37 Stat. 1733 (1912).

[16] *Environmental Assessment: Proposed Minor Boundary Modifications and Land Exchange for Olympic National Forest, Olympic National Park, State of Washington* 6 (1985); *see also Olympic: Historic Resource Study*, Nat'l Park Serv., https://www.nps.gov/parkhistory/online_books/olym/hrs/appa.htm ("*Olympic*").

duced because the President thought the land could be put to better use. President Truman reduced the Santa Rosa Island National Monument because the land was "needed by the War Department for military purposes." Proclamation No. 2659, 59 Stat. 877, 877 (1945). President Eisenhower removed 30,000 acres from a parcel reserved to protect a national monument because a portion of the monument had *already* come to "be[] used as an airfield for national-defense purposes" and was "no longer suitable for national-monument purposes." Proclamation No. 3089, 69 Stat. c27, c27 (1955). And Presidents Franklin Roosevelt and Eisenhower reduced such parcels to release "grazing land not deemed essential for monument purposes." Barbara J. Morehouse, *A Place Called Grand Canyon: Contested Geographies* 78 (1996); Proclamation No. 3360, 74 Stat. c27, c27 (1955).[17]

## C.

For much of the first century of the Antiquities Act's existence, Presidents' use of the Act first to declare national monuments and then to adjust the size of associated parcels was relatively uncontroversial. Several times, Congress made permanent the reservation of large parcels set aside to preserve large geographic features by converting national monuments into national parks. *See* Andy Kerr, *Many National Parks Arose from National Monuments*, Public Lands Blog (Nov. 10, 2017), https://www.andykerr.net/kerr-public-lands-blog-archive.[18]

We are aware of four occasions on which Congress publicly disagreed with the President regarding the exact boundaries of a specific declared monument, two of which led to significant reductions in the President's

[17] *See also* James Mackovjak, *Navigating Troubled Waters: A History of Commercial Fishing in Glacier Bay, Alaska* 28, https://www.nps.gov/parkhistory/online_books/olym/hrs/appa.htm (2010).

[18] A visitor would have trouble distinguishing the two, but only Congress can create a national park. National parks were once understood to protect areas containing more "resources" than national monuments. *What's In a Name? Discover National Park System Designations* (Sept. 27, 2017), Nat'l Park Serv., https://www.nps.gov/articles/nps-designations.htm. That distinction has become less clear in recent years, as declarations under the Antiquities Act have identified multiple resources as monuments to be protected on particular parcels. *See, e.g.*, Proclamation No. 9173 (2014) (adding more than 100 seamounts to the Pacific Remote Islands Marine National Monument).

power to *declare* monuments, but Congress has never amended the law to make clear that the President could never *decrease* the monument. *First*, in 1938, Congress expressed disagreement with the ultimate scope of the Mount Olympus National Monument as amended. Even then, Congress did not simply reinstate the monument as originally declared by President Theodore Roosevelt. Instead, Congress "abolished" that monument and created a national park, the metes and bounds of which it described in minute detail, 16 U.S.C. § 251, and which it has since expanded, *see Olympic*, *supra* note 16.

*Second*, in 1940, President Franklin Roosevelt proposed to reduce what is generally known as Grand Canyon II, a 273,145-acre national monument, by 71,854 acres. The proclamation stated that "it appears that certain lands within the Grand Canyon National Monument in the State of Arizona . . . are not necessary for the proper care and management of the objects of scientific interest situated on the lands within the said monument." Proclamation No. 2393, 54 Stat. 2692, 2692 (1940); *see also* Proclamation No. 2022, 47 Stat. 2547, 2547 (1932) (establishing Grand Canyon II). By that time, the original "Grand Canyon National Monument," established by President Theodore Roosevelt in 1908, *see* Proclamation No. 794, 35 Stat. 2175 (1908), had already become a national park, Pub. L. No. 65-277, 40 Stat. 1175 (1919). When the President proposed to reduce the Grand Canyon II monument, Congress passed a bill that would have reduced the size of the monument by 148,159 acres—double the amount that President Franklin Roosevelt had proposed. 84 Cong. Rec. 11,171 (1939). President Roosevelt pocket vetoed that bill, *see* 84 Cong. Rec. 10,984 (bill presented to the President on August 4, 1939), asserting that "it appears that insufficient consideration ha[d] been given to the matter" and calling for "a further survey on the ground . . . of the lands proposed to be eliminated from the national monument," 84 Cong. Rec. 11,171.[19]

*Third*, in 1950, Congress passed, and the President signed a law that added Jackson Hole National Monument to Grand Teton National Park. *See* Pub. L. No. 81-787, 64 Stat. 849 (1950). In so doing, however, Con-

---

[19] The second Grand Canyon National Monument was later redesignated as part of Grand Canyon National Park in 1975, including most of the land excluded by President Roosevelt in 1940. Grand Canyon National Park Enlargement Act, Pub. L. No. 93-620, 88 Stat. 2089 (1975).

gress amended the Antiquities Act to say that "[n]o further extension or establishment of national parks or monuments in Wyoming may be undertaken except by express authorization of the Congress." *Id.* § 1, 64 Stat. at 849 (codified as amended at 54 U.S.C. § 320301).

*Fourth*, in 1980, Congress provided that presidential "withdrawals exceeding 5,000 acres" of public lands in Alaska—including for monuments—would lose effect after one year without congressional approval. *See* Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 1326(a), 94 Stat. 2371, 2488 (1980) (omitting any reference to "reserving" the land).

### D.

This status quo continued until conservation efforts began to face what one scholar has decried as "a more organized anti-environmentalist movement" in the 1990s. Cameron King, *Green and Proud: Protecting the Antiquities Act as a Means of Fighting Climate Change and Promoting American Patriotism*, 77 SMU L. Rev. 841, 853 (2024). That is, in the 1960s and 1970s, "the Act played less of a role in American life" because "large segments of the United States . . . supported broad changes to environmental policy" favoring conservation. *Id.* at 852. By the mid-1990s, however, public support for additional environmental regulation began to wane, creating a perceived "necessity of achieving protection of public lands through unilateral presidential declarations." *Id.* That same political dynamic exists today as evidenced by the two proclamations highlighted in your question, which use the Antiquities Act not to protect only monuments or antiquities as understood by a "speaker of ordinary English," *Mass. Lobstermen's*, 141 S. Ct. at 980, but also to "add to President Biden and Vice President Harris's record-setting environmental legacy," The White House, FACT SHEET: President Biden Establishes Chuckwalla and Sáttítla Highlands National Monuments in California (Jan. 7, 2025), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/page/10/ ("FACT SHEET"); *accord* Christopher Klapperich, Note, *The New Frontier of Environmental Preservation: The Antiquities Act*, 58 Santa Clara L. Rev. 189, 191 (2018).

*First*, the Biden Administration declared the Chuckwalla National Monument in southern California, describing it as the "capstone action to create" the Moab to Mojave Conservation Corridor, "the largest corridor

of protected lands in the continental United States, covering nearly 18 million acres . . . along the Colorado River, across the Colorado Plateau, and into the deserts of California." FACTSHEET. Although the Proclamation does identify a number of specific items that could be considered "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest," 54 U.S.C. § 320301(a), the Proclamation makes little effort to describe how its massive expanse is nonetheless the "smallest" area necessary for their protection, *id.* § 320301(b). Rather, the thesis of the Proclamation is that "five geographically discrete areas located between Joshua Tree National Park and the Palen/McCoy Wilderness to the north, California State Route 78 to the east, the Chocolate Mountain Aerial Gunnery Range to the south, and the western boundary of the Mecca Hills Wilderness to the west" collectively represent a single monument containing a variety of different ecological, geological, biological, historical, religious, spiritual, or cultural items. Proclamation No. 10881, 90 Fed. Reg. 6715, 6715 (Jan. 14, 2025). The Proclamation then concludes that "objects of scientific and historic interest identified above," combined with the goal of "advanc[ing] renewable energy in Development Focus Areas (DFAs) that were identified by the Desert Renewable Energy Conservation Plan (DRECP) as of the date of this proclamation," justify the parcel's creation. *Id.* at 6720.

*Second*, the Biden Administration declared a vast "region" in the general vicinity of the Medicine Lake Volcano in California to be the Sáttítla Highlands National Monument. Again, rather than identify particular items of historic or scientific interest and draw a boundary around them, the Proclamation draws a boundary and then justifies it based on the "exceptionally varied habitats," which "support high levels of biodiversity, including a variety of sensitive and endemic species," that are located therein. Proclamation No. 10882, 90 Fed. Reg. 6727, 6727, 6730 (Jan. 17, 2025). In doing so, it notes that the same areas "provide[] exceptional outdoor recreational opportunities, including hiking, biking, snowmobiling, camping, hunting, scenic driving, and canoeing." *Id.* at 6731. Such activities are entirely expected in a park, but they are wholly unrelated to (if not outright incompatible with) the protection of scientific or historical monuments. *See* Robert Sterling Yard, *The National Parks Portfolio* 4 (Isabelle F. Story, ed., 6th ed. 1931); Murdock, *supra* note 2, at 353.

## E.

Amidst all this, Congress modernized the management of the National Park Service. As part of that effort, Congress amended the Antiquities Act "as positive law," *see* Pub. L. No. 113-287, sec. 3, § 320301, 128 Stat. 3094, 3259–60 (2014), to say in relevant part:

> **(a) Presidential Declaration.**—The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.
>
> **(b) Reservation of Land.**—The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

54 U.S.C. § 320301. That Congress enacted the bill as positive law means that Congress chose to restructure the Antiquities Act. *Cf. Schmitt v. City of Detroit*, 395 F.3d 327, 330 (6th Cir. 2004) (quoting 1 U.S.C. § 204(a)); *see also* 2 U.S.C. § 285b.

Since 2014, there have been various calls to further restrict the President's discretion under the Act. *See, e.g.*, H.R. 2645, 119th Cong. (2025); S. 220, 119th Cong. (2025); H.R.521, 119th Cong. Because none of those bills have yet made it out of committee, the 2014 amendment remains the operative text.[20]

## II.

## A.

"[W]e start, of course, with th[at] statutory text, and proceed from the understanding" that "statutory terms are generally interpreted in accord-

---

[20] Over the years, Congress has passed several statutes that affect how specific agencies interact with monuments, *e.g.*, 54 U.S.C. § 100506, or that make adjustments to previously declared monuments, *e.g.*, 16 U.S.C. § 450bb-6. A full survey of all such statutes is far beyond the scope of this memorandum. This analysis thus should be relied upon only in the absence of such a more specific statute.

ance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (cleaned up) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). The canons of construction help to inform the meaning of that text, but they serve only as "tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 n.5 (2021).

Because the Antiquities Act was significantly restructured in 2014, we would ordinarily need to determine which version of the statute controls. Both ordinary meaning and linguistic canons change over time. To avoid "distort[ing]" the original meaning of century-old statutes, we thus typically interpret acts of Congress in light of background legal principles as they existed at the time of enactment rather than "as if they were written today." *Goldstein v. California*, 412 U.S. 546, 564 (1973); *see also, e.g.*, *Gallardo v. Marstiller*, 142 S. Ct. 1751, 1761 (2022); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184–88 (5th Cir. 2020). At the same time, we cannot assume that later amendments were immaterial because amended statutes are interpreted based on their ordinary meaning and canons as they existed at the time of amendment. *See, e.g.*, *In re Benjamin*, 932 F.3d 293, 298 (5th Cir. 2019) (discussing *United States v. Wells*, 519 U.S. 482 (1997)); Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 22:34 (7th ed. 2009) ("Singer & Singer").

Whether the Antiquities Act should be examined through the lens of 2014 or 1906 is an exceedingly close question. On the one hand, the 2014 amendment was, to a certain extent, cast as a recodification. *See* Pub. L. No. 113-287. On the other, unlike some recodifications, Congress did not expressly provide "that changes in language resulting from the codification were to have no substantive effect." *Washington-Dulles Transp., Ltd. v. Metro. Washington Airports Auth.*, 263 F.3d 371, 379 (4th Cir. 2001) (quoting *Cass v. United States*, 417 U.S. 72, 82 (1974)). Instead, Congress recited its "intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments, *with such amendments and corrections* as will remove ambiguities, contradictions, and other imperfections." 54 U.S.C. § 100101(b) preceding note (emphasis added). Congress did not specify which provisions it was amending or correcting.[21]

---

[21] For this reason, we give no weight to a statement in the accompanying House Report that "[i]nformation from the Office of Law Revision Counsel indicates that the bill would

Distinguishing which provisions (if any) Congress amended or corrected from those which it merely recodified could matter because, generally speaking, amendments that merely recodify existing statutes are presumed not to work a substantive change to those statutes. *E.g.*, *Tidewater Oil Co. v. United States*, 409 U.S. 151, 162 (1972); Singer & Singer § 28:8. That canon applies, however, only where the changes are "stylistic," *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 85 (1st Cir. 2011), or the remaining language is ambiguous, *e.g.*, *S. Pac. Transp. Co. v. San Antonio*, 748 F.2d 266, 271 n.11 (5th Cir. 1984). It does not allow us to ignore substantive changes introduced in the course of recodification. *E.g.*, *Benjamin*, 932 F.3d at 298.

Though subtle, the 2014 amendment certainly could be read to substantively amend or substantially clarify the Antiquities Act in a way that directly impacts your question. The original text used one sentence to grant two interrelated powers: The President could "declare by public proclamation . . . objects of historic or scientific interest . . . to be national monuments, and [could] reserve *as part thereof* parcels of land" subject to certain conditions. Pub. L. No. 59-209, § 2, 34 Stat. at 225 (emphasis added). Those who ascribe to the view that a monument proclaimed under the Antiquities Act is irrevocable have read meaning into this single sentence, which linked the "objects" making up the monument to the power to "reserve" land from other uses. *Castle Pinckney*, 39 Op. Att'y Gen. at 188. That linkage meant that, in one step, the President created a "reservation" composed of both the historically or scientifically interesting objects and the land parcels necessary to maintaining them. *Id.*

To the extent such link ever existed, the 2014 amendment severed it, making clear that the statute empowers two separate, discretionary acts, which are discussed in two separate statutory subsections. That is, the President "may unilaterally 'declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or

---

make no substantive changes to the law; therefore, [the Congressional Budget Office ('CBO')] estimates that implementing H.R. 1068 would have no impact on the Federal budget." H.R. Rep. No. 113-44, at 4 (2013). When Congress wants a codification "not [to] be construed as making a substantive change in the laws replaced," it knows how to say so. Pub. L. No. 105-102, 111 Stat. 2204 (1997); *see also, e.g.*, Pub. L. No. 97-258, 96 Stat. 87 (1982). Congress chose to say something slightly different. That text is what is now the law.

scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments.'" *Mass. Lobstermen's*, 141 S. Ct. at 980 (quoting 54 U.S.C. § 320301(a)). And the President may reserve "parcels of land as a part of the national monuments," though those parcels must "be confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.* (quoting 54 U.S.C. § 320301(b)).

If this was a substantive change, Congress could be deemed to have ratified (or at least acquiesced to) the President's powers to modify prior declarations. As discussed above (*supra* Part I.B), Presidents had been asserting such powers for decades. By 2014, it was "hardly conceivable that Congress . . . was not abundantly aware" of the practice. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (quoting *Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983)). Indeed, that Congress never objected could itself be reason to argue that it agreed with the President's asserted authority. *See Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981); *Midwest Oil*, 236 U.S. at 469–71.

We ultimately need not decide, however, whether the 2014 amendment was sufficiently substantive that the scope of the President's discretion under the current statute should be read against the background principles of statutory construction as they existed in 2014. As we discuss in Part III.C, we do not consider *Castle Pinckney* to have been the best view of the Antiquities Act even in 1938. By reenacting the Antiquities Act in a way that splits those two powers into different provisions, Congress made pellucid what was always true—that each power is related to, but ultimately independent of, the other, and that the President may exercise one independently of the other. We start, however, with the current version of the Antiquities Act because it *is* current.

### B.

By 2014, it was clear that the President has discretion to reconsider a past President's discretionary act, such as the power to declare "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest . . . to be national monuments." 54 U.S.C. § 320301(a). The general rule is that the Executive "legally c[an] revoke or supersede [an] Executive order at will." *Proposals Regarding an Independent Attorney General*, 1 Op. O.L.C. 75, 77 (1977). "The same under-

standing would hold for other presidential instructions, such as memoranda and directives," *Status of Presidential Memorandum Addressing the Use of Polygraphs*, 2009 WL 153263, at \*8 (Jan. 14, 2009)—or in this case, a proclamation, *cf.* Memorandum for the President, from Larry A. Hammond, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Fifteen (15) Proposed Alaska National Monument Proclamations* at 8 (Nov. 29, 1978) (advising that the President "may . . . amend his proclamations [under the Antiquities Act] to substitute descriptions that conform with Executive Order 11,030").[22] Nothing in the text or context of the Antiquities Act overcomes the general rule. And the historical practice of Presidents revisiting past factual findings reinforces it. *Supra* Part I.B. We have identified no reason in law or logic that he could do so with respect to some but not all the monuments on a previously reserved parcel.

## 1.

Federal courts have routinely recognized the default rule that an executive entity empowered to act may reverse itself. For example, courts have recognized that, for executive agencies, "[t]he power to reconsider is inherent in the power to decide." *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950); *see also, e.g.*, *Macktal v. Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002); *Belville Mining Co. v. United States*, 999 F.2d 989, 998 (6th Cir. 1993). And our Office has recognized that this general rule can apply to land-use regulations as well—for example with regard to the Outer Continental Land Shelf Lands Act. *See* Memorandum for the Files, *Re: Legal Advice Relating to Proposed Executive Actions Permanently Withdrawing Land from Future Leasing Pursuant to the Outer Continental Shelf Lands Act* at 3–4 (Dec. 21, 2016) ("2016 Memo").

---

[22] For this reason, we find unpersuasive the assertion that use of the word "declare" renders a monument inherently irrevocable. *E.g.*, Squillace, *Authority*, *supra* note 6, at 56; Babcock, *supra* note 6, at 58. A declaration has long been understood to be merely a "formal statement, proclamation, or announcement, esp. one embodied in an instrument" such as an affidavit." *Declaration*, Black's Law Dictionary (10th ed. 2014); *accord Declaration*, Black's Law Dictionary (2d ed. 1910). It has no unique meaning in the context of a presidential action, and there is no "basis for drawing a distinction as to the legal effectiveness of a presidential action based on the form or caption of the written document through which that action is conveyed." *Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 20 (2000); *see also, e.g.*, 22 U.S.C. § 706; 7 U.S.C. § 624(d).

To be sure, this is merely a default rule, which "does not apply . . . where Congress has spoken," *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014), either explicitly, *see* 16 U.S.C. § 1609(a); S. Rep. No. 94-893, at 19 (1976), or by "provid[ing] a mechanism capable of rectifying mistaken actions" that impliedly restricts the agency's discretion, *see Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984); *see also* Daniel Bress, Note, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1766–69 (2005).

That default rule applies here. The Antiquities Act grants the President the discretionary authority to declare items of historic or scientific interest to be monuments. It is, however, "silent on the ability to revoke or diminish previous designations." Abigail M. Hunt & Robin M. Rotman, *Intersectional Management: An Analysis of Cooperation and Competition on American Public Lands*, 42 Stan. Env't L.J. 121, 140 (2023). At least by 2014, such silence was understood to mean the President has the authority to reconsider what objects should be protected as monuments. Thus, for the Antiquities Act, the power to declare carries with it the power to revoke.

## 2.

Historical practice reinforces this conclusion. Although "past practice does not, by itself, create power," *Medellín v. Texas*, 552 U.S. 491, 531–32 (2008) (quoting *Dames & Moore*, 453 U.S. at 686), "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," can "raise a presumption" that Congress meant to delegate that power, *Dames & Moore*, 453 U.S. at 686 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter J., concurring), and *Midwest Oil*, 236 U.S. at 474)). As discussed above, Presidents have consistently understood themselves to have the authority to de-designate monuments and to reduce parcels associated with existing monuments for a variety of reasons, including based on disagreements with their predecessors about whether particular objects are of historic or scientific interests and whether the land can be put to better use. *Supra* Part I.B.

The earliest legal analysis that we found by an executive agency expressly concluded that the President *could* revoke a monument. Memorandum for Franklin Knight Lane, Secretary of the Interior, from Preston

C. West, Solicitor, Dep't of the Interior (Apr. 30, 1915) ("West Memo"). This analysis was based on already extant caselaw discussing a military reservation, *United States v. Railroad Bridge Company*, 27 F. Cas. 686 (C.C.N.D. Ill. 1855), and an 1892 opinion by Assistant Attorney General Shields discussing the Timber Act, Opinion for the Secretary of the Interior, from Assistant Attorney General Shields (Feb. 13, 1892), *reprinted in* Forest Reservation—Withdrawal—Restoration, 14 Pub. Lands Dec. 209 (1892) ("Shields Opinion"). From these authorities, the Solicitor of the Department of the Interior concluded that a reservation such as that contemplated by the Antiquities Act "might be temporary or permanent, as, in the discretion of the President, the good of the public service might demand." West Memo at 2 (quoting Shields Opinion at 210). In particular, Solicitor West noted that Attorney General Shields had opined that "Congress intended to recognize the principle that the President has the power to withdraw public lands, and to restore the same to the public domain, as the public good may demand." *Id.* (quoting Shields Opinion at 210). After briefly taking the opposite view, the Solicitor of the Department of the Interior reaffirmed this position in 1935. Solicitor's Op. M-27657 at 1–2 (noting that broad statements to the contrary in intervening Attorney General opinions were not supported by the relevant statute).

We are not aware of any congressional discussion of this practice or these early opinions either in 1906 or 2014. But shortly after the Antiquities Act was enacted, the Supreme Court recognized that a 1909 proclamation withdrawing land from the public domain was "by no means the first instance in which the Executive, by special order, ha[d] withdrawn lands which Congress, by general statute, had thrown open to acquisition by citizens"—many of them "without express statutory authority." *Midwest Oil*, 236 U.S. at 469. The Court explained that such an unbroken (and unchallenged) record of Executive action to set aside public lands both temporarily and permanently must be understood to convey with it tacit congressional approval. *Id.* at 471. The same principle would apply here: The President has asserted the authority to rescind the declaration of specific objects to be monuments or to reduce the parcel of land required to protect and manage such a monument since the earliest days of the Antiquities Act. Yet Congress has never acted to remove that authority even when it substantially overhauled public-land laws as part of the

Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. § 1701, *et seq.*) ("FLPMA").

**3.**

If the President can amend a declaration to remove one object on a given parcel of land that his predecessor had deemed of interest, he can amend the declaration to remove all such objects. Or, put differently, if the President can declare that his predecessor was wrong regarding the value of preserving one such object on a given parcel, there is nothing preventing him from declaring that his predecessor was wrong about *all* such objects on a given parcel. *Cf. Withdrawal of Public Lands*, 40 Op. Att'y Gen. 73, 75 (1941) ("The President, therefore, was possessed, prior to the act of 1910, of authority to make reservations of public lands for permanent Federal uses and also to make withdrawals of such lands for temporary public purposes."); *Midwest Oil*, 236 U.S. at 476 (noting that "there is no distinction in principle between" an implied "power to make permanent reservations" and such a power "to make temporary withdrawals. . . . The character of the power exerted is the same in both cases"). Again, the text of the statute merely "permit[s] the President in his sole discretion to designate as monuments 'landmarks,' 'structures,' and 'objects,'" *Mass. Lobstermen's*, 141 S. Ct. at 981, around which a boundary can be drawn and a parcel of land reserved, 54 U.S.C. § 320301(b). The statute is silent regarding whether a current President may redraw that boundary, yet Presidents have done precisely that for a century. There is nothing in the Act's text, Congress's subsequent actions, or our legal tradition to suggest that the President can remove the protected status of *some* of the objects to be protected but cannot alter the factual findings as to *all* of them.

**4.**

In response to a subsidiary question you asked, to the best of our knowledge, no court has ever reversed a President's factual determination regarding what objects are to be protected. Four cases—*Cameron v. United States*, 252 U.S. 450 (1920), *Cappaert v. United States*, 426 U.S. 128 (1976), *United States v. California*, 436 U.S. 32 (1978), and *Alaska v. United States*, 545 U.S. 75 (2005)—"complete a rather thin

catalogue of Supreme Court cases addressing the Antiquities Act." Murdock, *supra* note 2, at 359. One discussed the Antiquities Act only in dicta. *See Alaska*, 545 U.S. at 113 (Scalia, J., concurring in part). The remaining three deferred to the President's factual determinations regarding what would constitute a monument. From this limited canon of Supreme Court cases, lower courts have derived a rule that a presidential proclamation need only "identif[y] particular objects or sites of historic or scientific interests and recite[] grounds for the designation that comport with the Act's policies and requirements." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1137 (D.C. Cir. 2002). One court even suggested that there might be separation of powers concerns should it seek to superintend the President's decision to a greater degree. *Id.* at 1135.[23]

We see no reason to think that a different rule would apply were the President to decide an object is *not* worthy of protection as a monument. Because the President is not an "agency" within the meaning of the Administrative Procedure Act ("APA"), the ordinary means with which to test the legality of executive action are not available. *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). On occasion, the Court has "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA," *Dalton v. Specter*, 511 U.S. 462, 474 (1994), but it has consistently recognized that "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President," *id.* (citing, *inter alia*, *Dakota Cen. Tele. Co. v. S.D. ex rel. Payne*, 250 U.S. 163, 184 (1919)). This is one such instance.

Even if there were a basis to draw such a distinction, this statute would be an odd place to draw it. "[I]n an Antiquities Act face-off, the [designating] President [already] plays with a stacked deck." Murdock, *supra* note 2, at 361–62. To override the designation of a sitting President, Congress would have to muster a two-thirds majority to override his veto. A subsequent President would need unified control of government. Citing constitutional concerns, courts have demonstrated considerable reluctance to grant a political actor almost-untrammeled authority to bind its succes-

---

[23] We take no view on such justiciability questions, as they are outside the scope of your questions and currently subject to litigation.

sors absent a very clear statement of Congress. *Cf. United States v. Winstar Corp.*, 518 U.S. 839, 874 (1996); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982). No such statement exists. Murdock, *supra* note 2, at 366 n.86.

## C.

We believe that the second presidential power granted by the Antiquities Act—the power to "reserve parcels of land," 54 U.S.C. § 320301(b)—also carries with it the power to reconsider a past President's exercise of that power.

### 1.

As Chief Justice Roberts noted in 2021, "[w]hile the Executive enjoys far greater flexibility in setting aside a monument under the Antiquities Act" than under many other public land-use statutes, "that flexibility . . . carries with it a unique constraint." *Mass. Lobstermen's*, 141 S. Ct. at 980. Always present, that constraint is now found in the second sentence of section 320301(b), which provides that "[t]he limits of the parcels [reserved under that section] shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." If the President has determined, in the exercise of his discretion, that there either never were, or no longer are, any objects "to be protected" on a given parcel, the smallest number of acres "compatible with the proper care and management" of such objects is zero.

The word "shall" has different meanings in different contexts. It can be a word of empowerment or authorization. *See, e.g.*, U.S. Const. art. II, § 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States."). Or it can serve as a limitation, requirement, or condition on such a grant of power. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016)—particularly when used in "contraposition to the word" may, *Jama v. ICE*, 543 U.S. 335, 346 (2005).

In the context of the Antiquities Act, "shall" is best understood as imposing a limitation on the President's otherwise expansive discretion. Congress provided that the President "*may* reserve parcels of land as a part of the national monument." 54 U.S.C. § 320301(b) (emphasis added). But it required that those parcels "*shall* be confined to the *smallest* area

compatible with the proper care and management" of that monument. *Id.* (emphases added). Congress emphasized that the smallest-area requirement applies "in all cases"—that is, in "every one." *Webster's Practical Dictionary* 11 (1906); *see also Webster's Third New International Dictionary* 54 (2002) (defining "all" to mean "every member of individual component of: each one of"); *All*, Black's Law Dictionary (2d ed. 1910) ("Black's Second") (defining "all" when used "distributively" to mean "equivalent to 'each' or 'every'").

This limitation is ongoing. "Although drafters, like all other writers and speakers, sometimes perpetuate linguistic blunders, they are presumed to be grammatical in their composition." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012) (footnote omitted). The requirement that "in all cases" any reservation "shall be confined" is expressly written in the future tense, *see Martin v. Hunter's Lessee*, 14 U.S. 304, 374 (1816), imposing a prospective limitation on any reservation under the Antiquities Act, *cf. In re County of Orange*, 262 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Irving Indep. Sch. Dist. v. Packard Props.*, 970 F.2d 58 (5th Cir. 1992)). Because that prospective limitation has no temporal bound, it "creates a continuing, as opposed to a one-time, duty to consider whether less acreage would be sufficient to fulfill the act's protective purposes." James R. Rasband, *The Future of the Antiquities Act*, 21 J. Land Resources & Env't L. 619, 627 (2001). As a result, whenever the President decides that a monument—that is, a specific landmark, structure or object—is no longer of sufficient scientific or historical interest to warrant Antiquities Act protection, what constitutes the smallest area necessary to protect any remaining objects of interest will likely change. If the President decides that there are *no* monuments worth protecting on a given parcel, the reservation cannot continue to exist because the smallest area necessary to protect and manage a defunct monument is no area at all.

## 2.

This plain-text understanding of the second sentence of section 320301(b) does not change because the first sentence of that section uses the word "reserve." When "a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (cleaned up); *see also* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev.

527, 537 (1947). In this instance, however, there is no universal definition of the term "reserve" to be incorporated.

Some who view monuments to be irrevocable have asserted that the term "reserve"—or, more precisely, the cognate "reservation"—carries a slightly different meaning than "withdraw" when used in public-land regulation. Specifically, the theory is that in the field of public land law, a "withdrawal" has traditionally been recognized as temporary and revocable by the executive officer who created it, whereas a "reservation" is permanent and can be disestablished only by Congress. *See* Memorandum for the Files from John P. Elwood, et al., Office of Legal Counsel, *Re: Legal Advice Relating to a Proposed Presidential Memorandum Revoking Withdrawals Issued Pursuant to the Outer Continental Shelf Land Act* at 4–7 (July 23, 2008) ("Elwood Memo").

We think proponents of this view overread the distinction. For example, some have relied on *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005), which does indeed reflect that "'withdrawal' and 'reservation' are not synonymous terms," *id.* at 784. But the distinction was not whether a present restriction on land use can be reconsidered. Instead, the opinion explains, a "withdrawal makes land unavailable for certain kinds of private appropriation." *Id.* (citing Charles F. Wheatley, Jr., 3 *Study of Withdrawals and Reservations of Public Domain Lands* at A–1 (1969)). By contrast, a reservation "goes a step further: it not only withdraws the land from the operation of the public land laws, but also dedicates the land to a particular use." *Id.* at 784; *see also Sierra Club v. Block*, 622 F. Supp. 842, 854–55 (D. Colo. 1985).

For at least two reasons, it does not necessarily follow that because land is dedicated to a particular use while a reservation is in place, the reservation itself cannot be reconsidered. *First*, there is nothing inherent in the use of the term "reservation" or "withdrawal" that renders the former permanent and the latter temporary. The ordinary meaning of "withdraw" has long been "to take back (something presented, granted, enjoyed, possessed, or allowed)." *Withdraw*, Black's Law Dictionary (10th ed. 2014) ("Black's Tenth"). Meanwhile, the ordinary meaning of "reservation" has been "a keeping back or withholding" and "[t]he setting apart of a designated part of a territory or tract of land for public uses or special appropriation." *Reservation*, Black's Tenth. Land can be "k[ept] back," "with[eld]," or "set[] apart" permanently or temporarily. *Accord*

*Withdrawn land*, Black's Tenth (treating "withdrawn land" as synonymous with "reservation"). Thus, use of the term "reserve" does not necessarily indicate a permanent dedication of public lands.

*Second*, the blurred line between "withdrawals" and "reservations" is amply demonstrated in still-extant federal law as both Congress and the Supreme Court "have occasionally used the terms interchangeably." *See S. Utah Wilderness All.*, 425 F.3d at 784. For example, Congress has authorized "the withdrawal and reservation" of public lands for the Department of Defense on both a temporary and a permanent basis. 43 U.S.C. § 155; *see also, e.g.*, Military Land Withdrawal Act of 2013, Pub. L. No. 113-66, § 2936, 121 Stat. 672, 1034 ("The withdrawal and reservation of public land [for Limestone Hills Training Area, Montana] shall terminate on March 31, 2039."). It has similarly required congressional approval to undo a "withdrawal," demonstrating that even if not interchangeable for all purposes with a "reservation," a "withdrawal" can be permanent. *See* National Forest Management Act of 1976, § 9, Pub. L. No. 94-588, 90 Stat. 2949, 2957 ("Notwithstanding the provisions of the Act of June 4, 1897 (30 Stat. 34; 16 U.S.C. 473), no land now or hereafter reserved or withdrawn from the public domain as national forests pursuant to the Act of March 3, 1891 (26 Stat. 1103; 16 U.S.C. 471), or any act supplementary to and amendatory thereof, shall be returned to the public domain except by an act of Congress.").[24]

---

[24] In reaching this conclusion, we considered but do not adopt the argument that a contrary result would allow Congress to improperly micromanage the President under *INS v. Chadha*, 462 U.S. 919 (1983). *See generally* John Yoo & Todd Gaziano, *Presidential Authority to Revoke or Reduce National Monument Designations*, 35 Yale J. on Reg. 617 (2018). Management of public lands is a power generally given to Congress, U.S. Const. art. IV, § 3, cl. 2, and Congress has long placed restrictions on the President's use of delegated powers dealing with public lands, *see, e.g.*, Act of June 12, 1858, § 6, 11 Stat. 332, 336; Act of June 30, 1919, § 27, 41 Stat. 1, 34 (1919). Moreover, we find more force in the assertions by some "that the Antiquities Act is an unconstitutionally broad delegation of Congress' power, because the President's authority to create monuments is essentially limitless" than that Congress has improperly sought to micromanage the President. Carol Hardy Vincent & Pamela Baldwin, *National Monuments and the Antiquities Act*, Cong. Research Serv., RL30528, at 8 (Apr. 17, 2001); *see also, e.g.*, Matthew W. Harrison, *Legislative Delegation and Presidential Authority the Antiquities Act and the Grand Staircase-Escalante National Monument—A Call for a New Judicial Examination*, 13 J. Env't L. & Litig. 409, 437–38 (1998). At the same time, it is also incorrect to assert that *because* Congress generally has the power to dispose of public lands, statutes em-

In sum, the term "reserve," standing alone, does not require permanency. As a result, there is nothing in the second sentence of section 320301 that changes the default rule that the President has continuing discretion to revisit prior discretionary decisions. And there is certainly nothing that overcomes Congress's mandate that such reservations "must be limited to the smallest area compatible with the care and management of the objects to be protected." *Mass. Lobstermen's*, 141 S. Ct. at 980–81.

## III.

### A.

For the reasons explained above, we believe the best view of the post-2014 version of the Antiquities Act is that the President may revisit previous exercises of authority under the Act, including by eliminating a previously reserved national monument. We now consider whether we nonetheless ought to adhere to *Castle Pinckney* as representing the best view of the Antiquities Act as enacted in 1906. 39 Op. Att'y Gen. 185. We should not.

For an opinion that has affected the use of millions of acres of public lands, *Castle Pinckney* is remarkably short and thinly reasoned. The crux of the opinion is that "[a] duty properly performed by the Executive under statutory authority" is effectively the same as the statute itself, and thus to assert the power to reconsider that decision would be "to claim for the Executive the power to repeal or alter an act of Congress at will." *Id.* at 187. To reach this conclusion, Attorney General Cummings invoked principles of trust law as well as the opinions of previous Attorneys General that "if public lands are reserved by the President for a particular purpose under express authority of an act of Congress, the President is

---

powering the President should never be read to include implied powers. *See, e.g.*, *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1020–31 (D. Alaska 2019), *vacated and remanded sub nom. League of Conservation Voters v. Biden*, 843 F. App'x 937 (9th Cir. 2021). Leaving aside that such a position is inconsistent with *Midwest Oil*, Congress's power to regulate interstate and international commerce is no less "plenary and exclusive." *United States v. Lara*, 541 U.S. 193, 200 (2004); *see also, e.g.*, *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932). Yet the caselaw discussed above regarding the implied power to reconsider was developed in just such a context. *Supra* Part II.B.1.

thereafter without authority to abolish such reservation." *Id.* at 186–87. In particular, *Castle Pinckney* cited *Rock Island Military Reservation*, 10 Op. Att'y Gen. 359 (1862), which advised that the President lacked the authority to rescind a reservation of Rock Island for military purposes under the Act of June 14, 1809, 2 Stat. 547. Moreover, *Castle Pinckney* contrasted the Antiquities Act with two other statutes granting the President authority to reserve public lands, both of which expressly provide the President with the authority to revoke those designations. *Id.* at 188 (citing Pickett Act, Pub. L. No. 61-303, § 1, 36 Stat. 847 (1910), *repealed by* FLPMA § 704(a), 90 Stat. at 2792; and then citing Act of June 4, 1897, 30 Stat. 11, 36 (1897)).

*Castle Pinckney* recognized that "the President from time to time has diminished the area of national monuments established under the Antiquities Act by removing or excluding lands therefrom, under that part of the act which provides that the limits of the monuments 'in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.'" *Id.* (quoting the Antiquities Act of 1906 § 2, 34 Stat. at 225). *Castle Pinckney* concluded that "it does not follow from [the President's] power so to confine that area" of a national monument "that he has the power to abolish a monument entirely." *Id.*

This Office does "not lightly depart from . . . past decisions, particularly where they directly address and decide a point in question," Memorandum for Attorneys of the Office from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* at 2 (July 16, 2010) ("2010 Best Practices Memo"). Nevertheless, we think "reconsideration is warranted here" for at least three separate reasons, which we will now "explain in detail." *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 176 (2018) ("*Wire Act*").[25]

---

[25] *See also, e.g.*, Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1471–74 (2010); Memorandum for Attorneys of the Office, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Opinions* at 1 (May 16, 2005).

**B.**

To start, we will reconsider an opinion if "intervening developments in the law appear to cast doubt upon our conclusions." *Id.* at 178. As noted above, *Castle Pinckney* leans very heavily on the fact that the Antiquities Act authorizes the President to "reserve" land. 39 Op. Att'y Gen. at 186–87. But "reserve" now appears in a completely different subsection from that which empowers to "declare" a monument, 54 U.S.C. § 320301(a)—an action that has long been understood to be subject to presidential reconsideration. *See supra* note 22. If this was a stylistic edit, *supra* Part II.A, the clarification by Congress only underscores that *Castle Pinckney always* put too much weight on the term "reserve." If the change was substantive, then *Castle Pinckney* has been abrogated. Either way, to prevent confusion and mistaken reliance, we have routinely withdrawn or disavowed opinions in the face of such changes in the legal landscape. *Application of Section 504 of the Rehabilitation Act to HIV-Infected Individuals*, 12 Op. O.L.C. 209, 210 n.4 (1988); *Reemployment of Government Employees Under Selective Training & Service Act*, 40 Op. Att'y Gen. 440, 443, 445–46 (1946).

"For the reasons explained, we conclude that [the prior] Opinion conflicts with the plain language" of the post-2014 Antiquities Act. *Wire Act*, 42 Op. O.L.C. at 176. Its analysis conflicts with the now-established default rule that the power to act carries with it the power to undo an action unless otherwise specified. *See supra* Part II.B.1. *Castle Pinckney* thus got things backwards in stating that "[a] duty properly performed by the Executive under statutory authority has the validity and sanctity which belong to the statute itself" and cannot be undone "unless it be within the terms of the power conferred by that statute." 39 Op. Att'y Gen. at 187 (quotation marks omitted).

**C.**

When deciding whether to depart from a past opinion, we also look to whether there were "errors in the supporting legal reasoning." *Wire Act*, 42 Op. O.L.C. at 178; *see, e.g.*, *Application of the Anti-Nepotism Statute to a Presidential Appointment in White House*, 41 Op. O.L.C. 49, 58–64 (2017). We have already identified a few. There are others.

## 1.

*Castle Pinckney* erred by ignoring certain "existing law," of which Congress "presum[ably]" was "knowledgeable" when it passed the Act. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988); *see also, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 698–99 (1979). Specifically, although the case law has certainly become clearer in the intervening decades, even by the time the Antiquities Act was passed, courts had already rejected the notions that the President can act to manage the public lands only if specifically delegated that power and that an exercise of such a delegated power is irrevocable.[26]

Most troubling, *Castle Pinckney* entirely failed to address the reasoning on which the Supreme Court based its 1915 decision in *Midwest Oil*. That case was roughly contemporaneous with (albeit falling slightly after) the Antiquities Act and represents the Supreme Court's first real effort to bring order to the "volatility of thought surrounding implied powers." *See* Murdock, *supra* note 2, at 404. *Midwest Oil* upheld the President's exercise of implied power to make a permanent reservation of public land where the exercise of that power formed part of a "long-continued practice, known to and acquiesced in by Congress." 236 U.S. at 474–75. It also rejected the notion that there is a "distinction in principle between"

---

[26] True, this principle could also be invoked for the Attorney General opinions upon which Attorney General Cummings relied. However, we do not think that would be consistent with the caution with which courts have treated ratification. *See Nat. Res. Def. Council, Inc. v. EPA*, 804 F.2d 710, 721 (D.C. Cir. 1986), *reh'g granted, judgment vacated sub nom. Nat. Res. Def. Council, Inc. v. EPA*, 810 F.2d 270 (D.C. Cir. 1987). Although binding upon the Executive Branch unless reconsidered, *see* 2010 Best Practices Memo at 1; *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 692 n.1 (4th Cir. 2019), the other branches look to such opinions only "for their persuasive value," *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 689 (D.C. Cir. 2023). Here, there are Attorney General opinions pointing in multiple directions. *Infra* Part III.C.2. And in the only instance of which we are aware that *Castle Pinckney* was specifically raised to Congress since the shift in usage of the Act in the late 1990s, it was discussed with notable skepticism. *See Executive Orders and Presidential Directives: Hearing Before the Subcomm. on Com. and Admin Law of the H. Comm. on the Judiciary*, 107th Cong. 56–57 (2001) (Testimony of James V. Hansen); *id.* at 106–07 (Testimony of Todd D. Gaziano).

withdrawals and reservations based on whether they are temporary or permanent. *Id.* at 476.[27]

*Castle Pinckney* similarly ignored *Grisar v. McDowell* and *United States v. Railroad Bridge Company*. *Grisar* examined title to certain lands in San Francisco, which the President had previously designated a military reservation. 73 U.S. (6 Wall.) 363, 381 (1868). In doing so, the Court stated—albeit in dicta—that the President "possessed the same authority in 1851 to modify the reservation of 1850, by enlarging or reducing it, that he possessed to make the reservation in the first instance." *Id.* at 371. This is irreconcilable with the premise of *Castle Pinckney* that once established by the President, a military reservation can only be disestablished by Congress.

*Railroad Bridge* held that the President has the implied authority to revoke a prior military reservation. 27 F. Cas. 686 (C.C.N.D. Ill. 1855). The court noted that "[t]he [P]resident, under a general power given to him" by Congress, "selected a part of the land on Rock Island for a military site." *Id.* at 690. In terms very similar to *Grisar* a few years later, the court stated that "when he [found] the place no longer useful as a military post, or for any other public purpose, he ha[d] a right to abandon it . . . . The possession of [Rock Island] was [thus] abandoned, and the right of government released through the same authority, by which it was appropriated." *Id.*; *see also* Murdock, *supra* note 2, at 401–05.

Although none is directly controlling, each case evidences an understanding contemporaneous with the Antiquities Act that the President has implied powers to change public-land use. That *Castle Pinckney* failed even to acknowledge the existence of such authorities—or the views of the Department of the Interior that it applies to the Antiquities Act—undercuts the weight that should be given the opinion. *See Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency*, 45 Op. O.L.C. __, at *15 (Dec. 21, 2021).

---

[27] Congress has since abrogated the authority specifically granted in Midwest Oil. FLPMA § 704(a), 90 Stat. at 2792; *see also Administration of Coral Reef Resources in the Northwest Hawaiian Islands*, 24 Op. O.L.C. 183, 201 (2000). As will be discussed below, we do not consider the FLPMA to control this analysis. *Infra* Part IV.B.

## 2.

The authority on which *Castle Pinckney* did rely—*Rock Island*, 10 Op. Att'y Gen. 359, which concerned the same former military base at issue in *Railroad Bridge*—is both off-point and suspect. In *Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498 (1839), the Supreme Court recognized that Congress can delegate (and had delegated) to the President the authority to choose locations for military posts. *Id.* at 512. But rather than relying on that authority,[28] *Rock Island* "assume[d] that the selection of Rock Island for the site of a military fortification," combined with a number of other pieces of evidence such as "the erection and continued occupancy of that fortification" had "the same legal effect . . . as if [the reservation] had been done by a special act of Congress." 10 Op. Att'y Gen. at 362. From there, Attorney General Bates extrapolated that "the Executive can no more destroy his own authorized work, without some other legislative sanction, than any other person can." *Id.* at 364.

We are aware of no authority from the 1860s supporting such a broad assumption that informal executive action to establish a military reservation is for all legal purposes treated the same as exercising a "duty . . . statutory[il]y authori[zed]." *Id.* To be sure, "occupancy of the lands for military purposes" can result in the establishment of an "informal" military reservation. *Camp Wright, California*, 16 Op. Att'y Gen. 121, 123 (1878). And such an informal reservation can have many of the same attributes as a formal reservation,[29] but they are not the same for all legal purposes.[30] A full survey of the ways in which various types of reserva-

---

[28] *Rock Island* certainly *references* the earlier statute, but the opinion also references other sources of authority. 10 Op. Att'y Gen. at 359. Because *Rock Island* does not explain its reasoning in key points, it is unclear whether Attorney General Bates thought the statute was not properly invoked, was insufficient alone to justify the reservation, both, or neither. We interpret Bates' assertion that the reservation had the "same legal effect" as one declared under the relevant statute that he understood the reservation to be informal. *See id.*

[29] For example, Congress "has defined Indian country broadly to include formal and informal reservations" as well as other types of territory. *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993) (citing 18 U.S.C. § 1151).

[30] For example, military reservations are areas of exclusive federal jurisdiction only if "exclusive jurisdiction was reserved at the time land was granted to the [S]tate" in which the reservation was located or the State ceded that jurisdiction back to the federal government. *The Military Commander and the Law* 132 (2016), https://dacipad.whs.mil/

tions of public land are similar and vary is far beyond the scope of this memorandum. For present purposes, the point is that there *are* differences. One way in which an informal military reservation differs from a formal one—let alone from other types of reservations—is how they may be disestablished. *Id.* Specifically, within a few years of *Rock Island*, Attorney General Charles Devens unequivocally stated that such informal reservations "could be restored to the ordinary conditions of public lands" without an act of Congress. *Id.*; *accord Grisar*, 73 U.S. at 371. For that to happen, formal abandonment was necessary, not "mere discontinuance of their use as a military post." *Camp Wright, California*, 16 Op. Att'y Gen. at 123. But it is hard to get more formal than a presidential declaration that a parcel will no longer be reserved.

*Rock Island* also dismisses *Railroad Bridge*, asserting that the judge would have come to a different conclusion "if he had given to the question under consideration a more careful and thorough examination." 10 Op. Att'y Gen. at 370. But the only facts that judge supposedly overlooked were that "the Rock Island reservation had remained in the possession of the War Department, and was actually in its possession by its authorized agent." *Id.* at 370–71. This premise is also suspect: According to the U.S. Army, the base had indeed been "largely abandoned . . . by 1836" and remained so until July 11, 1862 when Rock Island was turned into an arsenal by act of Congress—seven years after *Railroad Bridge* but four months before Attorney General Bates penned his opinion.[31] As a result, it is hardly surprising that the Island was at the time of the opinion in possession of the War Department's "authorized agent." But *Rock Island* does not even mention Congress's action, making it unclear whether the facts as they existed in 1862 skewed Attorney General Bates's view of the facts as they existed nearly a decade earlier in a way that is legally significant for purposes of *Castle Pinckney*. After all, whether the Presi-

---

images/Public/10-Reading_Room/04_Reports/03_DoD_Reports_Regs_Surveys/AirForce_Military_Commander_Law_Chap5_2016.pdf. A reservation established by informal means is less likely to meet one of the categories for exclusive federal jurisdiction, though we do not opine on the specifics of any particular institution.

[31] *See* Sgt. 1st Class Corinna Baltos & U.S. Army Sustainment Command, *Arsenal of Democracy: A History of Rock Island Arsenal from Its Beginnings Through the Civil War*, U.S. Army (June 2, 2022), https://www.army.mil/article/257216/arsenal_of_democracy_a_history_of_rock_island_arsenal_from_its_beginnings_through_the_civil_war.

dent can overturn by executive fiat a reservation by act of Congress is a very different question than either whether he can abandon a military outpost assumed to have been reserved by occupation or whether he can reconsider a monument created pursuant to a congressional delegation.[32]

Moreover, even if *Rock Island*'s analysis were sound, it is by its terms limited to the military context. In that context, Congress once permitted the President to sell "all military sites, or . . . such parts thereof which are or may become useless for military purposes." Act of March 3, 1857, 11 Stat. 200, 203. But Congress then removed that authority. Act of June 12, 1858, § 6, 11 Stat. 332, 336. Given this statutory history, it is hardly surprising that several Attorneys General opined that the President lacked the authority to unilaterally undo reservations of public land for military purposes. *E.g.*, *Naval Reservation—Restoration to Public Domain*, 21 Op. Att'y Gen. 120, 121 (1895); *Military Reservation at Fort Fetterman*, 17 Op. Att'y Gen. 168, 168–69 (1881). But that same history means that such opinions should not be assumed to be a good guide for interpreting the Antiquities Act—a context in which, unlike the military context, Congress has been entirely silent as to the power to modify or revoke a monument designation or an associated reservation.

### 3.

To the extent *Castle Pinckney* put any weight on its fleeting reference to trust law (which is far from clear), that too was wrong—as was the opinion's treatment of the fact that Castle Pinckney had been ceded by the State of South Carolina for use as a military base. 39 Op. Att'y Gen. at 188. Although the President serves as Commander in Chief of the military, U.S. Const. art. II, § 2, cl. 1, the establishment of military *bases* implicates at least three different congressional powers above and beyond the Property Clause: the powers to "raise and support Armies," *id.* art. I, § 8, cl. 12; to "provide and maintain a Navy," *id.* art. I, § 8, c.13; and

---

[32] To the extent Attorney General Bates thought that such an action would not have been possible had the President exercised an implied power to abandon the prior military base, that is a non-sequitur. Removing land from a reservation would not have ceded federal ownership of Rock Island, only returned it "to the ordinary condition of public lands." *Camp Wright*, *California*, 16 Op. Att'y Gen. at 123; *see also* S. Rep. No. 48-193, at 1–2 (1884) (discussing a bill authorizing the President to abandon military reservations once their utility had passed).

(most importantly) to buy or accept lands from States "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings," *id.* art. I, § 8, cl. 17.

At the risk of oversimplification, when Congress buys or accepts land from a State for a military base—as it did with Castle Pinckney—it often creates a federal enclave subject to unique jurisdictional rules about who can enforce what laws against whom. *See, e.g.*, Derek P. Radtke, Note, *State Encroachment into Tribal Sovereignty by Means of the Assimilative Crimes Act*, 19 Whittier L. Rev. 655, 663–72 (1998) (summarizing the application of the Assimilative Crimes Act to different types of federal enclaves). There is an argument that such a designation cannot be undone simply by removing military forces from a facility.

The same is *not* necessarily true when the President declares a national monument. The Antiquities Act applies only to land "owned or controlled by the Government of the United States" and has no effect on its title. *California*, 436 U.S. at 40–41 (quoting 1906 Antiquities Act § 2, 34 Stat. at 225); *see also* 54 U.S.C. § 320301(a). A proclamation under the Antiquities Act "d[oes] not and could not enhance the strength of the Government's basic claim to a property interest," but instead "means no more than that the land is shifted from one federal use, and perhaps one federal managing agency, to another." *California*, 436 U.S. at 40. An area of exclusive federal jurisdiction *could* be established within a national monument—but only if Congress either reserved exclusive jurisdiction when the State entered the union, or through one of two forms of agreement with the State in which it is located. *See Defs. of Wildlife v. Everson*, 984 F.3d 918, 925 (10th Cir. 2020); *see also, e.g.*, 16 U.S.C. § 24 (establishing exclusive jurisdiction over Yellowstone National Park). That is far from a universal occurrence even with regard to national parks. *Cf. CGP Permitting in Lands of Exclusive Federal Jurisdiction*, EPA (Apr. 9, 2025), https://www.epa.gov/npdes/cgp-permitting-lands-exclusive-federal-jurisdiction (listing which parks fall within exclusive federal jurisdiction). It is even rarer with respect to national monuments.

### 4.

Finally, *Castle Pinckney* is both wrong and internally inconsistent to the extent it relies on contemporaneous statutes to establish a common understanding of the term "reserve" that allows modification of a monu-

ment but not its revocation. As already discussed, no such uniform definition of "reserve" exists even today, *supra* Part II.C.2, and *Midwest Oil* rejected such a clear distinction between a temporary withdrawal and permanent reservation, 236 U.S. at 475–76. Even if neither of those were true, the contemporary definition of a "reservation" in this context uses "a tract of land, more or less considerable, in extent, which is by public authority *withdrawn* from sale or settlement, and appropriated to specific public uses." *See Reservation*, Black's Law Dictionary (1st ed. 1891) (emphasis added); *see also Reservation*, Black's Second (providing a materially identical definition of "reservation"). *Castle Pinckney* never explains how to reconcile the clear distinction it draws between a withdrawal and a reservation when even contemporaneous legal dictionaries treated the concepts as being equivalent in the relevant sense.

To be sure, there are statutes of a similar vintage that provided more detail regarding the circumstances under which a withdrawal or reservation could be reconsidered. For example:

- The Pickett Act of 1910, which is cited frequently as support for the permanency of monuments, authorized the President to "at any time in his discretion, temporarily *withdraw* from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and *reserve* the same for water-power sites, irrigation, classification of lands, or other public purpose to be specified in the orders of withdrawals, and such *withdrawals or reservations shall* remain in force *until revoked by him or by an Act of Congress*," § 1, 36 Stat. at 847 (emphases added); *see, e.g.*, Mark Squillace, *The Looming Battle Over the Antiquities Act*, Harv. L. Rev. Blog (Jan. 6, 2018), https://harvardlawreview.org/blog/2018/01/the-looming-battle-over-the-antiquities-act/;

- The Reclamation Act of 1902, Pub. L. No. 57-161, § 3, 32 Stat. 388, 388, provided that "the Secretary of the Interior shall, before giving the public notice provided for in section four of this Act, *withdraw* from public entry the lands required for any irrigation works contemplated under the provisions of the Act, and shall restore to public entry any of the lands so *withdrawn* when,

in his judgment, such lands are not required for the purposes of this Act." (emphases added); and

- The 1897 amendments to the Timber Act expressly authorized the President "at any time to modify any [e]xecutive order that has been or may hereafter be made establishing any forest *reserve*, and by such modification may reduce the area or change the boundary lines of such *reserve*, or may vacate altogether any order creating such reserve." 30 Stat. at 36 (emphasis added).

One inference that *could* be drawn from these contemporaneous statutes that expressly provided for revision or revocation of other public-land reservations is that Congress intended to deny the Executive such power by its silence in the Antiquities Act. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

But we do not think such an inference *should* be drawn here because none of these statutes compares to the Antiquities Act in text, structure, purpose, or history. *See Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 165 (3d Cir. 2015) (rejecting an analogous argument due to "statutory . . . purpose and context"). None of these statutes has an express requirement that the reserved parcel be the smallest compatible with the purpose of the reservation. The resulting structure of the Antiquities Act's interlocking powers has thus always been unique.[33] As to purpose, the Act was designed to address a specific problem: vandalism by settlers moving into distant areas of the Southwest. *Supra* Part I.A. As the history of its use has proven, the need to protect against such vandalism could prove permanent or entirely temporary once appropriate experts are able to fully explore the area surrounding the declared monument. *Supra* Part I.B. Although theoretically possible, that is far less likely in, for example, a forestry reserve designed to protect a particular species of trees.

If anything, the phrasing in those statutes seems to negate any notion that withdrawals were understood to be inherently temporary, reservations

---

[33] The Pickett Act arguably does not even *grant* revocation authority but could be interpreted to recognize a power that already existed. *Cf. Midwest Oil*, 236 U.S. at 469 (citing *Grisar* for longstanding executive practice).

inherently permanent. Take the Pickett Act. Consistent with the definitions above, withdrawal under that Act took the relevant property out of the public use, and the reservation set that land aside for a specific purpose. But both could be revoked by the President (or Act of Congress). 36 Stat. 847.

Moreover, the canon against superfluity is not an unwavering command, and "redundancy is not a silver bullet." *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019)*.* Sometimes Congress deliberately "employ[s] a belt and suspenders approach" to clarify what a statute permits. *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020). And "the force of th[e superfluity] canon is diminished" when it is used to compare different statutory schemes, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). In this instance, the rule against superfluity is not a particularly useful guide to what the Antiquities Act meant in 1906 (or means now) for at least three reasons.

*First*, adopting *Castle Pinckney*'s view of the Antiquities Act—which acknowledges a presidential power to modify prior proclamations—does not solve the superfluity problem. For example, it relies on the Timber Act, which also specifically provides the President the power to *modify* a prior reservation. *See* 30 Stat. at 36. Yet *Castle Pinckney* acknowledged that the President has always been able to exercise such a power under the Antiquities Act even though it expressly appears nowhere in the text. 39 Op. Att'y Gen. at 188.

*Second*, earlier iterations of the bill that became the Antiquities Act belie any well-established understanding that all reservations were permanent. The clearest example can be seen in a Senate draft, which distinguished between "temporary withdrawals" and "permanent withdrawal" rather than "withdrawals" and "reservations." S. 5603, 58th Cong. (1905) (as introduced in the Senate on January 19, 1905). Another draft specifically would have limited its coverage to "ruins" that were of "sufficient value and importance to be worthy of protection as permanent objects of interest and of scientific value." H.R. 9245, 56th Cong. (1900). It too was rejected, and the word "permanent" omitted from the reservations authorized by the Act. It is always dangerous to infer meaning from unenacted statutes. *Cf. Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). But as a group, these drafts suggest

there was no clear understanding of "reservation" as inherently perma-nent, and "withdrawal" as inherently temporary.

*Third*, the larger legal context, including debates within Congress re-garding these same statutes, demonstrate uncertainty rather than a settled understanding on the question of the President's power to revisit a prior land reservation without specific authorization of Congress.[34] Consider, for example, the debate regarding the amendment to the Timber Act cited by *Castle Pinckney*. Nine years *before* the Antiquities Act, Representative John Pickler of South Dakota stated regarding modification authority: "The President has had . . . always" as part of the power to create the reservation. 29 Cong. Rec. 2677 (1897). Representative John Lacey of Iowa, who would later sponsor the Antiquities Act, rebuffed this notion as "mistaken," stating that the relevant text "gave [the President] the power to create a reserve, but no power to restrict it or annul it, and there ought to be such authority vested in the President of the United States." *Id.* This disagreement reflects the unsettled status of the President's revocation authority at the time.

Four years *after* the Antiquities Act, the Senate report accompanying the Pickett Act "categorically asserted that the power set forth in the proposed bill *already existed in the President*. The bill was recommended to make the matter 'definite and clear.'" *Withdrawal of Public Lands*, 40 Op. Att'y Gen. 73, 78 (1941) (emphasis added) (quoting S. Rep. No. 61-171, at 4 (1910)). By that point, the "difference of opinion" was "as to the extent of [the President's] authority" to "withdraw lands for certain purposes" rather than its existence. *Id.* (quoting H.R. Rep. No. 61-983, at 1 (1910)). Due to those "conflicting opinions," the Pickett Act was "deemed necessary to adopt a measure that will clearly define the extent of such authority." *Id.* As discussed above, the language of the Pickett Act is entirely consistent with the notion that the President has authority to revoke the reservation of land for a particular public purpose

---

[34] For the avoidance of doubt, we do not rely on these debates regarding unrelated stat-utes to demonstrate the meaning of the word "reserve" in the Antiquities Act. Even if the comments were about the Antiquities Act, they would be entitled to little (if any) weight as they reflect the views of only the individuals speaking. We cite them to demonstrate only that questions of implied presidential power to manage public lands were *being* debated.

and any distinction between a "withdrawal" and a "reservation" was illusory, *supra* Part II.C.2.

It is admittedly unclear at what point between 1897 and 1910 the shift occurred, and it came to be accepted that the President has *some* power to reconsider a prior land reservation. If Representative Lacey's 1897 opinion that a land-use statute needs to expressly authorize the President to modify or vacate a reservation were the prevailing view of Congress, however, then the Antiquity Act's omission of an express power to modify would mean that "[t]here is no provision of law now by which the reserves" declared by one President "can be realigned and the boundaries located, in order to leave out portions that ought not to have been included." 29 Cong. Rec. 2677 (1897); *see also* 30 Cong. Rec. 911 (1897) (statement of Sen. William Allison). Because that is *not* how the Antiquities Act has been understood since the earliest days of its existence, *supra* Part I.B, we think the better view is that the Antiquities Act provided the President with an implicit power to reconsider his past decisions even in 1906.

What debates did occur over the Antiquities Act focused on the need to provide flexibility for quick action—not permanency. In particular, the archeologists who lobbied for the bill told the Senate Public Lands Committee that the Act was "preservative rather than administrative" and was intended to "meet immediate contingencies" associated with pot-hunting. *See* Hal Rothman, *Preserving Different Pasts: The American National Monuments* 39 (1989) (quoting S. Doc. 58-314 at 5). For example, Dr. Francis W. Kelsey emphasized the need for "immediate action—if possible, to pass, by general consent perhaps, some kind of bill that will make it possible instantly to stop these depredations and maintain the monuments in status quo until such time as Congress shall be at liberty to deal with the matter in detail and enact laws similar to those which have so long been in force on the continent of Europe." S. Doc. 58-314, at 5. Limits on available technology in 1906 meant that monuments frequently had to be declared site unseen—or at least un-surveyed. *See* George M. Lubick, *Petrified Forest National Park: A Wilderness Bound in Time* 59 (1996); Rothman, *Navajo*, *supra* note 15, at 20. It would have been, at minimum, in tension with the expressed concerns of Western congressmen that the Act would lead to abuses akin to those under the Timber Act to assume without a clear statement that such spur of the moment deci-

sions were simultaneously permanent. *Supra* Part I.A.[35] No such clear statement exists.

*Castle Pinckney*'s failure to fully and adequately address this historical context, combined with the many other faults in its reasoning, lead us to believe that it should no longer serve as Executive Branch precedent.

## D.

Finally, we will reconsider an opinion that "was not in accord with" other interpretations by the Executive Branch—either before, *Statutory Rollbacks of Salary to Permit Appointment of Member of Congress to Executive Office*, 33 Op. O.L.C. 201, 201 (2009); or since, *Applicability of the Emoluments Clause to the Nongovernmental Members of ACUS II*, 34 Op. O.L.C. 181 (2010). *Castle Pinckney* is such an opinion, creating confusion with real, practical consequences.

## 1.

As already noted, both before and after *Castle Pinckney*, Attorneys General have issued a number of opinions whose reasoning is difficult to square with the conclusion that an action pursuant to a congressional delegation cannot be undone except by act of Congress. For example, in addition to those already mentioned, Attorney General Cummings himself opined in 1934 that the President is "impliedly authorized to revoke, in whole or in part, an [e]xecutive order" organizing staff within the Executive Branch even without express statutory authorization. *See Revocation of Executive Order Issued Under the Reorganization Act of March 3, 1933, as Amended*, 37 Op. Att'y Gen. 418, 418–19 (1934). Although not related to land use, that reasoning is inconsistent with his subsequent claim that if the President were to assume the right to reconsider where none had been granted, it would be for him to "claim for the Executive the

---

[35] For many of the same reasons, it is a non-sequitur to infer that because the law was passed to address "concern[s] that spectacular public land resources might be harmed before Congress could act to protect them," the designation of a monument "must remain until revisited by Congress." Squillace, *Legacy*, 37 Ga. L. Rev. at 553–54. A declare-first, revisit-later approach to monuments would have served to maintain the status quo pending a determination whether ruins required further protection either by continued effect of the proclamation or a separate act of Congress. *Supra* Part I.A.

power to repeal or alter an act of Congress at will." *Castle Pinckney*, 39 Op. Att'y Gen. at 187. In recent decades, our advice has been consistent with Attorney General Cummings' earlier view. *Supra* Part II.B.

This discrepancy cannot be entirely explained by some special rule involving land reservations. As noted above, the 1892 Shields Opinion regarding the Timber Act served as a significant part of the basis for the Department of the Interior's early decision that the President's power to declare monuments was subject to reconsideration. *Supra* Part II.B.2. That opinion limits *Rock Island* and similar opinions to the military context. 14 Pub. Lands Dec. at 210–11. It unequivocally stated that "[t]he power of the President to reserve lands for public purposes is too well established to require any discussion." *Id.* at 212. And it held that "[i]t logically follows" that the President has the authority "to restore the land . . . to the status it occupied prior to the reservation, unless that power is restricted by statute, as in the case of military reservations." *Id.* (citing, *inter alia*, *Bullard v. Des Moines & Fort Dodge RR*, 122 U.S. 167, 175 (1887)). *Castle Pinckney* neither discussed this opinion nor explained why a military reservation is an appropriate analogue for a monument when it was an inappropriate analogue for a forest.

In 1923, Attorney General Seymour opined that when the President reserved public lands for lighthouse purposes pursuant to his *implied* authority under *Midwest Oil*, he also possessed the authority to transfer that land to other departments for new uses when the land was no longer needed for lighthouses. *See Transfer of Lighthouse Reservations*, 33 Op. Att'y Gen. 436, 437 (Feb. 3, 1923) ("*Lighthouse*"). *Lighthouse* recognized in a footnote that there were prior opinions suggesting that where Congress has authorized the President to reserve lands for particular purposes, he is not automatically authorized to revoke those reservations. *See id.* at 437 n.1. True, *Lighthouse* distinguished those decisions as "rest[ing] on an Act of Congress having no application" to lighthouses. *Id.* But the opinion in question was attempting to reconcile general rules regarding the disposition of property under a pre-*Midwest Oil* regime with a statute that specifically provided what will happen when the reservation "shall become useless for military purposes." *Camp Hancock—Transfer from War Department to Department of Agriculture*, 28 Op. Att'y Gen. 143, 144–45 (1910). Unlike *Castle Pinckney*, it did *not* recognize a general rule that Congress must create a power to revoke before that power can exist.

Since *Castle Pinckney*, distinctions between different public-land statutes have become increasingly blurry and confusing. For example, as noted above, this Office has opined that withdrawals pursuant to the Outer Continental Shelf Lands Act, Pub. L. No. 83-212, 67 Stat. 462, 469 (1953) ("OCSLA"), are subject to reconsideration of the President even if Congress provided no express authority for the President to abolish a reservation of public lands. Elwood Memo at 7; *see also* 2016 Memo at 3. In concluding as much, we tried to reconcile our past advice, and in particular to distinguish *Castle Pinckney*, on the sole ground that a withdrawal is a temporary action that does not include a reservation. Elwood Memo at 9. But that is an unstable distinction because, as already discussed, it relies on an imprecise description of the sources upon which that advice relied. *Supra* Part II.C.2. "Withdrawals" and "reservations" both place conditions on how land may be used—a withdrawal by prohibiting particular uses, a reservation by requiring others. Neither speaks directly to duration.[36]

## 2.

Confusion regarding the status and effect of *Castle Pinckney* has had very real effects. For example, in 2002, this Department relied on *Castle Pinckney* in *Alaska v. United States*, in arguing that the United States retained title to certain marine submerged lands within Glacier Bay National Monument. *See* Motion of the United States for Partial Summary Judgment and Memorandum in Support of Motion on Count IV of the Amended Complaint at 36, 40, *Alaska v. United States*, No. 128, Original (July 24, 2002).

Further, the ongoing existence of *Castle Pinckney* has needlessly complicated litigation challenging the President's authority to alter the declarations of his predecessors. Following President Trump's 2017 decision to substantially reduce but not eliminate the Bears Ears and Grand Staircase-Escalante National Monuments, the parties spent considerable resources litigating whether those actions should be considered revocations

---

[36] Notwithstanding this Office's efforts to distinguish OCSLA from the Antiquities Act, a district court has expressly invoked *Castle Pinckney* and *Rock Island* to justify holding that a withdrawal under the former is no more revocable than a reservation under the latter. *League of Conservation Voters*, 363 F. Supp. 3d at 1027–28 & n.74.

as to certain monuments located on a given parcel—in no small part be-cause *Castle Pinckney* opined that reduction but not elimination of a parcel was permissible. *See, e.g.*, Tribal Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment at 23, *Hopi Tribe v. Trump*, No. 1:17-cv-2590 (D.D.C. Jan. 9, 2020) (citing *Castle Pinckney* as first au-thority in support of primary argument that the reduction of the Bears Ears monument violated the Antiquities Act); Memorandum in Support of TWS Plaintiffs' Motion for Partial Summary Judgment at 35, *Wilderness Society v. Trump*, No. 1:17-cv-02587 (D.D.C. Jan. 9, 2020) (Grand Staircase).

Such litigation makes little sense compared against the text of the stat-ute: Presidents have long been understood to have the power to come to a different factual decision regarding whether particular objects within a previously reserved monument merit protection. *Supra* Part I.B. For large parcels with multiple monuments (like Chuckwalla and Sáttítla High-lands), there is no principled distinction between determining that one object is not worth protecting or all of them—and, by operation of law, no reasoned distinction between reducing and eliminating the parcel. *Supra* Part II.B.3. Our Office has previously reconsidered past advice to avoid such needless disputes. *Cf. Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *48 (Jan. 8, 2021). We do so again here.

For these reasons, *Castle Pinckney* can no longer be relied upon as Ex-ecutive Branch precedent.

## IV.

Apart from the 1938 opinion, we have identified three counterargu-ments that merit discussion.[37] None changes our conclusion.

## A.

The most practically significant objection that we have identified to our understanding that the President can revisit what land is to be "reserve[d]" under the Antiquities Act is a perceived inconsistency with the Supreme

---

[37] Perhaps underscoring the shakiness of *Castle Pinckney*'s own reasoning, academics have offered a smattering of additional arguments for why the declaration of a national monument is irrevocable. In an effort to keep this memorandum of manageable size, we do not discuss those arguments to the extent they appear squarely foreclosed or otherwise unlikely to move a court.

Court's recent ruling that only a clear statement from Congress can change the boundaries of an Indian "reservation." *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). An Indian "reservation" is a unique concept with a unique history derived from a unique constellation of laws and traditions. Although some aspects of the law governing Indian reservations also apply to other reservations, as with military reservations, *supra* Part III.C.2, it would be a category error to assume that Congress intended to import the entire legal landscape associated with Indian reservations any time it used a variant of the word "reserve." Instead, different types of reservations must be analyzed in light of their individual legal contexts.

### 1.

Due in large part to dramatic shifts in policy towards Native Americans, "federal law has not been consistent in its choice of terms to refer to tribal political units, individuals, and lands." *Cohen's Handbook of Federal Indian Law* § 4.02[1] n.3 (2024 ed.) ("*Cohen's*"). The concept of land being set aside for use by tribes appeared in treaties as early as the 1830s, but the term "reservation" did not come into use in federal Indian law until decades later. *McGirt*, 591 U.S. at 901–02. Instead, early treaties used a variety of terms to describe lands set apart from the public domain for what would come to be known as a "reservation"—including the word "withdraw." *See, e.g.*, Treaty with the Chippewa of Saginaw art. 1, Aug. 2, 1855, 11 Stat. 633; Treaty with the Ottawa and Chippewa art. 1, July 31, 1855, 11 Stat. 621. Even now, though a number of statutes are tied to a tribe's "reservation," the term lacks "a simple, universal meaning in federal law." Conf. of W. Attys' Gen., *American Indian Law Deskbook* § 12.10 (2023 ed.).

How such a reservation arose varied over time. Originally, what would later come to be known as a "reservation" was established by treaty. *Cohen's* § 18.02[1][a]. Congress prohibited future such treaties in 1871. *Id.* & n.62 (discussing Act of March 3, 1871, ch. 120, § 1, 16 Stat. 544); 25 U.S.C. § 71. Since then, the tribes and the United States have continued to negotiate "property questions, such as cessions," but they are resolved "by means of agreements that Congress enact[s] into positive law." *Cohen's* § 18.02[1][a]. Those statutes used a variety of terms, including "set aside," or "reserved," "'reserved for the sole use and occupancy,' or something similar." *Id.*

As particularly relevant here, "[b]etween 1855 and 1919, 23 million acres of land were set aside from the public domain by executive order," for "permanent use and occupancy." *Id.* (quoting Exec. Order, Aug. 2, 1915). But the set-aside was not actually permanent in all instances. For example, orders tinkered with existing boundaries of reservations by "restor[ing] existing reserved lands to the public domain and withdraw[ing] in lieu of those lands [other] designated lands." *Id.* (citing Exec. Order, Feb. 2, 1911). Or they might be conditioned on the occurrence of a named event. *Id.* n.95 (citing Exec. Order, May 7, 1917; Exec. Order, May 9, 1912).

As with treaties, Congress barred the President from creating reservations by executive order not long after the Antiquities Act was enacted (and well before *Castle Pinckney*). Act of June 30, 1919, § 27, ch. 4, 41 Stat. 3, 34. Within a decade, Congress had also specifically provided that "[c]hanges in the boundaries of reservations created by [e]xecutive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." 25 U.S.C. § 398d. Thus, to the extent that Attorney General Cummings had Indian reservations in mind when he made his broad statements about the meaning of the term "reserve," he was correct that by 1938, the boundaries of Indian reservations *were* effectively permanent. But not because they were called "reserves" (or "reservations"). They were permanent because Congress said so, *id.*—an explicit statement of legislative policy that has never been extended to the Antiquities Act.

## 2.

Moreover, Indian reservations are a poor analogue for parcels reserved under the Antiquities Act due to the complicated relationship among "reservations," title, and legislative jurisdiction, which has varied across time, space, and method of creation. "When Indian reservations were created, either by treaty or by executive order, the Indians held the land by" what was frequently called Indian or aboriginal title, namely, "the right to possess and occupy the lands for the uses and purposes designated." *Spalding v. Chandler*, 160 U.S. 394, 403 (1896). That same term was used "[u]ntil the middle of the twentieth century . . . to refer to treaty lands as well as to lands held in original Indian title." Cohen, *supra*, § 18.02[1][a]. A separate term began to develop, however, for "tribal

property that has been formally acknowledged by the United States through treaty or statute"—"recognized title." *Id.* Unlike aboriginal title, such recognition "define[d] the boundaries of land held" by the tribe and conferred rights under the Fifth Amendment Takings Clause. *Id.*

"In the latter 19th century," Congress further complicated the relationship between reservation status and title when it "enacted a series of individual allotment acts." Marc Slonim, *Speech*, *Indian Country, Indian Reservations, and the Importance of History in Indian Law*, 45 Gonz. L. Rev. 517, 522 (2010). Although this legislation "curtailed individual Indian property rights by placing restraints on the alienation of allotted land," Nell Jessup Newton, *Federal Power over Indians: Its Sources, Scope, and Limitations*, 132 U. Pa. L. Rev. 195, 226 (1984), the result was a sharp drop in Indian land ownership and a patchwork of non-Indian ownership within the boundaries originally set for reservations, Slonim, 45 Gonz. L. Rev. at 522.

Over time, Indian reservations became more closely tied to jurisdiction than to *any* notion of title. For example, in 1948, Congress amended the Major Crimes Act to apply to "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, all dependent Indian communities within the borders of the United States[.]" 18 U.S.C. § 1151; *see Cohen's* § 4.04[2][b].[38] At the time of the Antiquities Act, reservations were seen not as "particular parcels of land" that could "be expressed in deeds, as dealings between private individuals," but instead as "impos[ing] a servitude upon every piece of land as though described" in the treaty establishing the reservation. *United States v. Winans*, 198 U.S. 371, 381 (1905).

Importantly, unless authorized by statute, reservations made by executive order did not necessarily convey the same interest to the tribe as reservations created by statute or treaty. All three branches have recognized that reservations that began under executive order are equivalent to

---

[38] Since then, reservations have become far more closely tied to statutes defining legislative and adjudicative jurisdiction within a particular geographic area. *E.g.*, *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2493–94 (2022); *Ashcroft v. U.S. Dep't of Interior*, 679 F.2d 196, 199 (9th Cir. 1982). As noted above, except in the rare circumstances of a cession by the relevant State, state law has always applied in parcels reserved around a national monument or in a national park. *Supra* Part III.C.3.

those established by Congress for nearly every purpose. *See* General Indian Allotment Act of February 8, 1887, § 1, 24 Stat. 388; *Executive Order Indian Reservations-Leasing Act*, 34 Op. Att'y Gen. 181, 186–89 (1924); *Arizona v. California*, 373 U.S. 546, 598 (1963). With one exception: In the limited instances when the issue has arisen, courts have recognized that a reservation arising solely from executive order could be rescinded by executive order, which affected related property rights. *Confederated Band of Ute Indians v. United States*, 330 U.S. 169, 176 (1947); *see also Sioux Tribe of Indians v. United States*, 316 U.S. 317 (1942). Such a view is entirely consistent with our view that the President may reconsider a declaration under the Antiquities Act notwithstanding its use of the term "reserve."

## B.

We have also considered the argument that the FLPMA § 204(a), Pub. L. No. 94-579, 90 Stat. 2743, 2751–54 (1976) (codified at 43 U.S.C. § 1714(a)), implicitly ratified *Castle Pinckney*. That statute replaced 29 previous statutes that provided the President with authority to withdraw land from the public domain, *id.* § 704, 90 Stat. at 2792, with an authorization to the Secretary of the Interior "to make, modify, extend, or revoke withdrawals . . . in accordance with the provisions and limitations of this section," which included public notice requirements, congressional notification requirements for larger withdrawals, certain "emergency" withdrawal procedures, and certain renewal procedures, *id.* § 204, 90 Stat. at 2751–54. But it specifically provides that the Secretary of the Interior "shall not make, modify, or revoke any withdrawal . . . creating national monuments under the [Antiquities Act]." *Id. See* Richard H. Seamon, *Dismantling Monuments*, 70 Fla. L. Rev. 553, 597 (2018) (discussing the argument).

The language from section 204 of the FLPMA is inapposite. It says that "the *Secretary*" of the Interior may not "make, modify, or revoke" lands withdrawn pursuant to an Act of Congress. FLPMA § 204(j); 90 Stat. at 2754 (emphasis added). The FLPMA thus leaves untouched the authority that the *President* enjoys under the Antiquities Act.

To say otherwise would require the reader to infer from legislative history regarding a bill that never passed that Congress made a fundamental drafting error. An earlier version of that bill would have transferred the

power to declare monuments from the President to the Secretary. The theory that the FLPMA ratified *Castle Pinckney* is, in essence, that Congress excised that transfer but forgot to delete the language preventing the Secretary from modifying or revoking existing monument designations. The only support for that proposition comes from a House report.[39]

Leaving aside that legislative history is rarely a reliable indicator of statutory meaning, courts are loathe to conclude that Congress made such a mistake if there is another explanation of the relevant language. *Corley v. United States*, 556 U.S. 303, 315 (2009). Here, the language can easily be explained as another example of "belt and suspenders" legislating. *Atl. Richfield Co.*, 140 S. Ct. at 1350n.5. Before the FLPMA, the general rule was that a reservation established by Congress could only be *dis*established by Congress (at least) absent express authorization. *United States v. Celestine*, 215 U.S. 278, 285 (1909). The broad power granted by section 204(a) of the FLPMA could be argued to create just such a delegation as well as to allow the Secretary to alter a prior proclamation by the President; section 204(j) makes "crystal clear rather than just clear," that it should not be. *In re Collins*, 170 F.3d 512, 513 (5th Cir. 1999).

Indeed, to the extent that it is relevant at all, the text of the FLPMA supports our view by collapsing the distinction between a "withdrawal" and a "reservation" that drives the analysis of *Castle Pinckney. Supra* Part III.C.4. In an apparent effort to bring order to the multifarious ways in which Congress has described the process of setting aside public lands, it specifically defined the term "withdrawal" to include *any* "withholding [of] an area of Federal land from settlement, sale, location or entry." 43 U.S.C. § 1702(j). This includes actions that "limit[] activities . . . to maintain other public values" (*i.e.*, withdrawals), and those that "reserv[e] the area for a particular public purpose or program (*i.e.*, reservations). And—*except* in expressly identified circumstances (including the Antiquities Act context)—Congress empowered the Secretary to revoke those withdrawals even where they would previously have been called reservations. *See* 43 U.S.C. § 1714(a), (j).

---

[39] *Compare* Public Land Policy and Management Act of 1975, 94th Cong., House Subcommittee on Public Lands, Committee on Interior and Insular Affairs, Markup Print No. 2, §§ 204(a), 604(c), at 23–24, 92 (Sept. 8, 1975), *with* Public Land Policy and Management Act of 1975, 94th Cong., House Subcommittee on Public Lands, Committee on Interior and Insular Affairs, Markup Print No. 4 (Mar. 16, 1976).

## C.

Finally, supporters of the theory that a national monument is irrevocable have insisted that no President has revoked a national monument. *E.g.*, Wyatt, *supra* note 14, at 3. By contrast, they insist, *Congress* has abolished national monuments, Squillace, *Legacy*, 37 Ga. L. Rev. at 550 n.453, including at the request of the Executive, *see, e.g.*, Act of March 29, 1956, Pub. L. No. 84-447, 70 Stat. 61; S. Rep. No. 84-1656; S. Rep. No. 81-2148 (1950).[40]

We certainly agree that "the longstanding practice of the government can inform our determination of what the law is." *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (cleaned up). But a statement that the President has never revoked a national monument is typically premised on a misunderstanding of what the monument *is* under the Antiquities Act— the object to be protected or the parcel set aside for its protection. *Supra* note 14. As discussed at length above, the historical record reflects examples of the President de-designating certain objects as national monuments and adjusting a reserved parcel accordingly. *Supra* Part I.B.

Moreover, longstanding practice is useful only to the extent it reflects a shared understanding between the political branches of the meaning of a statute. In our system of divided government, the Executive can neither create power it was never granted, *see Medellín v. Texas*, 552 U.S. 491, 532 (2008), nor cede power to which it was assigned, *cf. Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472–73 (2001). Presidents have "transformed" the Antiquities Act into what the Chief Justice has described as "a power without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea." *Mass. Lobstermen's*, 141 S. Ct. at 981. A lack of historical evidence regarding how Presidents may respond to such "unprecedented action" is both unsurprising and uninformative. *Medellín*, 552 U.S. at 532. It certainly cannot be read to overcome the

---

[40] *See also, e.g.*, *To Abolish the Castle Pinckney National Monument, and For Other Purposes: Hearing Before the Subcomm. on Pub. Lands of the H. Comm. on Interior and Insular Affs.*, 84th Cong. 2 (1955) (noting that the Department of the Interior had advised that Castle Pinckney "is not of sufficient historical significance to warrant its continuance in the national park system"); *Various Bills: Hearings Before the S. Comm. on Interior and Insular Affs.*, 84th Cong. 36 (1955) (noting that the totem poles that formed the Kasaan National Monument "have disintegrated").

Act's clear requirement that "[a]ny land reserved under the Act must be limited to the smallest area compatible with the care and management of the objects to be protected." *Mass. Lobstermen's*, 141 S. Ct. at 980–81.

## V.

For the reasons discussed above, we conclude that the Antiquities Act permits the President to alter a prior declaration of a national monument, including by finding that the "landmarks," "structures," or "objects" identified in the prior declaration either never were or no longer are deserving of the Act's protections. 54 U.S.C. § 320301(a). Because Congress directed that the "parcels of land" reserved in connection with such a monument be "confined to the smallest area compatible with the proper care and management of the objects to be protected," *id.* § 320301(b), this can have the effect of eliminating entirely the parcel previously associated with a national monument. *Castle Pinckney*'s contrary conclusion was wrong, and it can no longer be relied upon.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
